Helena WOODARD, Appellee,

v.

Minakshi CHATTERJEE, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 8, 2003.
Filed May 29, 2003.
Reargument Denied July 23, 2003.

**434**

John A. Anastasia, Blue Bell, for appellant.

Jeffrey Shorr, Philadelphia, for appellee.

BEFORE: KLEIN, BENDER, and CAVANAUGH, JJ.

OPINION BY BENDER, J.:

¶ 1 Minakshi Chatterjee (Defendant) appeals from the June 26, 2002 order in which the trial court denied her motion for post trial relief and entered judgment on the jury verdict in addition to delay damages in favor of Helena Woodard (Plain-

tiff). We reverse and remand for a new trial.

¶ 2 A brief factual and procedural history follows. On June 26, 1998, the parties were involved in a motor vehicle accident at the intersection of 5th and Lombard Streets in Philadelphia. Each party was driving in their own, separate vehicles, and were traveling westward on Lombard Street, which is a one-way street consisting of two travel lanes. Defendant, while attempting to make a right turn onto 5th Street from the left lane on Lombard Street, collided with Plaintiff who was traveling in the right lane on Lombard Street. Plaintiff suffered various injuries as described specifically below.

¶ 3 On May 12, 2000, Plaintiff filed a complaint sounding in negligence. The case first went to compulsory arbitration and, on January 31, 2001, the arbitrator awarded $5,000 to Plaintiff. Defendant appealed the arbitrator's award and demanded a jury trial.

¶ 4 The case went to trial before a jury on October 9, 10, and 11, 2001. The jury entered a verdict in favor of Plaintiff in the amount of $50,000. Defendant filed timely post trial motions seeking a new trial. On June 21, 2002, the trial court denied Defendant's post trial motions, entered judgment in favor of Plaintiff, and awarded delay damages to Plaintiff. This order was docketed on June 26, 2002. On July 22, 2002, Defendant filed a timely notice of appeal to this Court and subsequently filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) as ordered by the trial court.

¶ 5 In this appeal, Defendant argues that certain trial testimony of Plaintiff's expert witness and treating physician, Thomas G. Del Giorno Jr., D.O., (1) went beyond the fair scope of his expert report and (2) constituted inadmissible hearsay.[1] Before delving into the merits of these issues, it is necessary to describe the testimony Defendant claims was inadmissible and the context in which this testimony arose.

¶ 6 On the evening of the accident, Plaintiff had low back pain, which worsened the following day. N.T. Trial, 10/9/01, at 37. Plaintiff treated herself at home by, for example, using heating pads and doing stretching exercises. Id. at 39. However, after having difficulty getting out of bed one morning, she decided to see her family physician, Dr. Del Giorno, on July 15, 1998. Id. at 38–39. Plaintiff saw Dr. Del Giorno for treatment five times between July 15, 1998, and October 12, 1998. Dr. Del Giorno's Initial Report, 10/16/98, at 1. Plaintiff also sought treatment from a chiropractor, Wellington S. Whitlock, III, D.C., who first saw her on October 9, 1998. Dr. Whitlock referred Plaintiff to Frank P. Baskin, D.O., for electromyography (EMG) and nerve conduction studies (NCS), which Dr. Baskin performed on October 23, 1998. Dr. Baskin's impression of the EMG results, as later reiterated by Dr. Whitlock in his report, included a diagnosis of cervical radiculopathy.[2]

¶ 7 The EMG and the diagnosis of acute cervical radiculopathy, as stated in the reports of Dr. Baskin and Dr. Whitlock, are the focus of this appeal. Essentially, Dr. Del Giorno, Plaintiff's only expert present-

---

1. Dr. Del Giorno's testimony was read into the record from the transcript of his trial deposition, which had been taken on October 3, 2001, i.e., six days prior to trial.

2. As noted below, in his trial deposition, Dr. Del Giorno indicated that "cervical" means neck and "radiculopathy" refers to nerve pain that travels. Trial Deposition of Dr. Del Giorno (hereinafter "Trial Deposition"), 10/3/01, at 31.

ed at trial, testified about these matters, although he did not make any mention of them in his pre-trial reports.[3] Dr. Del Giorno submitted two pre-trial reports to Plaintiff's attorney, i.e. his "initial report" dated October 16, 1998, and his final report dated June 26, 1999.

¶ 8 In his initial report, Dr. Del Giorno made the following diagnoses: (1) acute anxiety; (2) post-traumatic cephalgia;[4] (3) acute dorsal[5] sprain/strain; (4) acute lumbar[6] sprain/strain; (5) radicular[7] leg pains; and (6) pain-induced insomnia. Dr. Del Giorno's Initial Report, 10/16/98, at 1. With regard to cervical injury, Dr. Del Giorno merely noted that Plaintiff had a prior motor vehicle accident (MVA) in October of 1997 with "some lingering neck pain and stiffness" but that her "neck pain has lessened." Id. at 1. Notably, Dr. Del Giorno's initial report does not include a diagnosis of cervical injury related to the accident at issue in this case.

¶ 9 However, in his final report, Dr. Del Giorno included a diagnosis of acute cervical sprain/strain. Dr. Del Giorno's Final Report, 6/1/99, at 1. In contrast to his initial report, Dr. Del Giorno stated, inter alia, that Plaintiff experienced increased neck pain immediately after the accident. Id. He reiterated that Plaintiff had a prior MVA in October of 1997 with "some mild lingering neck pains," but in contrast to his initial report, he added that Plain-

tiff's neck pains were exacerbated in intensity following the accident at issue in this case.[8] Id. Also, in his final report, he summarized his impressions at the time of Plaintiff's initial exam as "acute anxiety, post-traumatic cephalgia, acute cervical and lumbar sprain/strain, as well as radicular bilateral leg pains." Id. (emphasis added). These diagnoses are essentially the same as those listed in his initial report, except that his initial report did not include a diagnosis of cervical sprain/strain. Moreover, in his final report, Dr. Del Giorno listed the following "final diagnoses": (1) chronic lumbar sprain/strain; (2) restricted lumbar ranges of motion; and (3) pain-induced insomnia. Id. at 2. Clearly missing from his list of "final diagnoses" is a diagnosis pertaining to cervical injury related to the June 1998 MVA.

¶ 10 In addition to Dr. Del Giorno's reports, Plaintiff also provided Defendant' with the reports of Dr. Whitlock and Dr. Baskin. On October 9, 1998, Plaintiff presented to Dr. Whitlock, a chiropractor, who treated her until November 9, 1998. Dr. Whitlock's Initial Report, 10/9/98, at 1. In his initial report, Dr. Whitlock indicated, inter alia, that Plaintiff complained of "pain radiating into her left lower extremity; neck pain and stiffness; left upper extremity pain and stiffness." Id. Notably, Dr. Del Giorno did not record any complaint of upper extremity pain and

---

3. Defendant admits to having access to the reports of Dr. Del Giorno, Dr. Whitlock, and Dr. Baskin prior to trial, but claims to have not anticipated that Dr. Del Giorno would testify about the EMG and the cervical radiculopathy diagnosis made by Dr. Whitlock, since Dr. Del Giorno did not address such matters in his reports.

4. Cephalgia is the medical term for headache. Medline Plus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last visited 4/3/03).

5. Dorsal means "being or located near, on, or toward the back or posterior part of the human body." Id.

6. Lumbar means "of, relating to, or constituting the loins or the vertebrae between the thoracic vertebrae and sacrum." Id.

7. Radicular means "of, relating to, or involving a nerve root." Id.

8. The accident at issue in this case is sometimes hereinafter referred to as the June 1998 MVA.

stiffness in either of his reports. Dr. Whitlock made several diagnoses including post-traumatic chronic cervicobrachial syndrome. *Id.* at 2. He concluded that Plaintiff's injuries were a result of the accident at issue. *Id.* at 3. He suggested that Plaintiff might require an EMG of her upper and lower extremities, and referred her to Dr. Baskin for performance of the same. *Id.*

¶ 11 Plaintiff saw Dr. Baskin for an EMG on October 23, 1998. Report of Dr. Baskin addressed to Dr. Whitlock, 10/30/98, at 1. In his report, Dr. Baskin stated that, since the time of the June 1998 MVA, Plaintiff has had "posterior cervical spine pain radiating into the upper extremities bilaterally" with the pain worse on the left side and "associated numbness involving the left hand." *Id.* Again, although Dr. Del Giorno indicated in his final report ·that Plaintiff had neck pain that was exacerbated after the accident, he did not mention pain radiating to her upper extremities. Dr. Baskin concluded in pertinent part as follows: "Acute deinnervation was seen on needle EMG examination of the left first dorsal interossei which is consistent with C8–T1 [9] radiculopathy on the left." *Id.* at 2. This statement constituted the totality of Dr. Baskin's interpretation of the EMG performed on Plaintiff, and he made no statement pertaining to a causal connection between the June 1998 MVA and these findings.

¶ 12 After receiving the EMG results, Dr. Whitlock submitted his "discharge report" dated November 11, 1998. In his discharge report, Dr. Whitlock summarized injuries Plaintiff suffered prior to the June 1998 MVA, including a work-related injury in July of 1993 to her neck, upper back and knee, and the injury to her neck from the October 1997 MVA, as previously noted in Dr. Whitlock's and Dr. Del Giorno's reports. *Id.* at 1. Dr. Whitlock further reported as follows:

Due to the pain Ms. Woodard was having in her neck region, upper back region and into her upper extremities and ·also her low back into her lower extremities, she was referred to Frank Baskin, D.O., for an EMG and NCV evaluation to rule out radiculopathy as a source of her pain in her lower and upper extremities.

On 10/23/98, Dr. Baskin's office performed EMG and NCV studies on the lower extremities. Dr. Baskin's interpretation of the neurodiagnostic evaluation was that of a normal study of the lower extremities with no evidence of lumbar radiculopathy. Also performed were EMG and NCV of the upper extremities and cervical spine which was also performed by Dr. Frank Baskin. ***His diagnostic results were that of an acute denervation through EMG examination which was consistent with a C8–T1 radiculopathy on the left side.***

*Id.* at 2 (emphasis added). Dr. Whitlock further stated that, at Plaintiff's last visit to his office on November 11, 1998, she had complaints of "upper back pain and stiffness into the cervicothoracic junction region and, over the course of her làst two visits, she reported to us that she did have left upper extremity and lower extremity radicular type symptoms including pain, stiffness, numbness and tingling." *Id.* at 3. He concluded his discharge report as follows: "In closing, it is my professional health opinion that Ms. Woodard's condition is partially related to previous injuries she had from 1993 to 1997 which were severely aggravated by the current incident which occurred on 6/26/98." *Id.* at 3.

¶ 13 Plaintiff presented only Dr. Del Giorno as an expert at trial. Defendant

---

**9.** "C8–T1" refers to certain vertebrae primarily in the lower neck region.

first objected when Plaintiff's counsel informed Dr. Del Giorno that he would be asking questions with respect to the tests and reports of Dr. Whitlock and Dr. Baskin. Dr. Del Giorno Trial Deposition, 10/3/01, at 12–13. Although Dr. Del Giorno testified that he reviewed these other doctors' reports, *id.* at 13, Defendant's counsel noted, on the record, that in the reports received from Dr. Del Giorno during discovery, there was no mention of his reliance upon, or any reference to, the reports and opinions of Dr. Whitlock and Dr. Baskin. *Id.* Accordingly, Defendant argued that such testimony would be beyond the fair scope of Dr. Del Giorno's reports and would constitute hearsay. *Id.* at 13–14.

¶ 14 Specifically, Defendant notes the following objectionable testimony of Dr. Del Giorno during his direct examination by Plaintiff's counsel:

Q: Could you explain to the members of the jury what an EMG test is?

A. EMG, the initials stand for electromyography. That's where electrical impulses are sent through tissue, either muscle or nerve, and they have a predictable speed, in other words, when you start a muscle impulse of one area of muscle, it travels to a different area of the muscle, but it takes a certain time.

And, in injured areas, the time is increased, it takes longer for the impulse to get through. And that's measurable, you can see that, and you could infer the presence of muscle and/or nerve damage.

Q. And the purpose of the EMG is to measure that problem?

A. It measures injury to muscles and nerves.

Q. Can a patient affect the outcome of an EMG test?

A. No, sir.

Q. When did Dr. Baskin perform this test?

A. Dr. Baskin did this test on October 23, 1998.

Q. And what were the results of that test?

A. His interpretation was nerve conduction studies were within normal limits, however, there was acute denervation on needle EMG of the left first dorsal interossei, that's muscles in the hand, which is consistent with C8, which is the lower cervical disk space.

Q. When you say cervical, you mean neck?

A. Neck. And T1, which is the thoracic, that's the bones right below the neck.

Q. It's consistent with the C8–T1 what?

A. Radiculopathy.

Q. And what does a radiculopathy mean?

A. Radiculopathy refers to pain that travels, nerve pain that travels.

Q. . . . . I want you to explain to me as well as the jury, what does it mean when the test shows an acute radiculopathy versus chronic radiculopathy?

A. Well, chronic generally refers to anything that has gone on longer than six months. So if someone has knee pain, it goes on for nine months, you would say that's chronic knee pain.

If it's acute, generally it's four months, five months, or less.

Q. And in this particular case, the test in this case revealed an acute denervation consistent with a C8–T1 radiculopathy on the left. What would that indicate to you as far as it being acute?

[DEFENDANT'S COUNSEL]: Objection again. To the extent that these opinions that the Doctor is giving are based upon Dr. Baskin's EMG report, I just want to make sure my objection is

clear that I'm objecting to his explaining these terms and telling what it means to him because that's not evident in any one of his own reports.

THE WITNESS: Acute in this case is referable to an incident, to an accident that has occurred within four or five months.

Q. So is it reasonable to conclude from a medical standpoint that since it's acute in nature that it didn't exist from the accident that occurred in October of 1997?

A. Yes, sir, it's reasonable to conclude that.

Q. And if it had been from the accident that occurred in 1997, what would you have expected the test to show?

A. It would have shown a chronic problem.

. . .

Q. Lastly, Doctor, was the treatment that Ms. Woodard underwent, including the physical therapy, your office visits where you examined her, the testing that she underwent, including the EMG, the injections that you gave her, all reasonable and necessary to treat her for the injuries that you diagnosed?

[DEFENDANT'S ATTORNEY]: Objection as to the EMG.

THE WITNESS: Yes, sir.

Q. And what it that opinion, Doctor?

A. They were all necessary and reasonable.

Q. Lastly, Doctor, have all of your opinions that you've given today been to within a reasonable degree of medical certainty?

A. Yes, sir.

Trial Deposition, 10/3/01, at 30–33, 39–40. In her interpretation of this testimony, Defendant argues that "Dr. Del Giorno's testimony was a clear attempt to establish that the EMG results prove that a cervical radiculopathy was present and could not have occurred as a result of the prior October 1997 accident. It further attempts to establish that it occurred no more than four to five months prior to the test (i.e. dating back to June 26, 1998 approximately) and lastly that the EMG was reasonable and necessary as a result of the June 26, 1998 motor vehicle accident." Defendant's brief at 15.

¶ 15 Now that the disputed testimony and the context in which it arose is set forth, we can proceed with our legal analysis of Defendant's issues on appeal, *i.e.* whether Dr. Del Giorno's testimony went beyond the fair scope of his report and/or whether such testimony constituted inadmissible hearsay such that Defendant should have been granted a new trial. We first note that we will not reverse a trial court's decision to deny a motion for a new trial absent an abuse of discretion or error of law. *Vallone v. Creech,* 820 A.2d 760, 763 (Pa.Super.2003). "To reverse the trial court, the [S]uperior [C]ourt must consider all the evidence in the light most favorable to the appellee and conclude that the verdict would be changed if another trial were granted." *Brady v. Ballay, Thornton, Maloney Med. Assocs., Inc.,* 704 A.2d 1076, 1079 (Pa.Super.1997).

¶ 16 Moreover, "[t]he admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." *Walsh v. Kubiak,* 443 Pa.Super. 284, 661 A.2d 416, 419 (1995) (*en banc*). If the trial court made an erroneous evidentiary ruling that caused harm to the complaining party, the only remedy is to grant a new trial. *Oxford Presbyterian Church v. Weil–McLain Co., Inc.,* 815 A.2d 1094, 1099 (Pa.Super.2003). "When improperly admitted testimony may have affected a

verdict, the only correct remedy is the grant of a new trial." *Id.* (citation and internal quotation marks omitted).

¶ 17 Pursuant to Pa.R.C.P. 4003.5(a)(1)(b), "a party may, during discovery, require his adversary to state the substance of the facts and opinions to which his or her expert is expected to testify and a summary of the grounds for each opinion." *Feden v. Consolidated Rail Corp.,* 746 A.2d 1158, 1161 (Pa.Super.2000). "The purpose of this provision is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony." *Id.* (citation omitted). The fair scope rule, addressed specifically in Pa. R.C.P. 4003.5(c), "provides that an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate report." *Walsh,* 661 A.2d at 420. Rule 4003.5(c) reads in full as follows:

> To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5(c). The purpose of this rule is "[t]o prevent incomplete or 'fudging' of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor." Pa.R.C.P. 4003.5(c), cmt. In other words, the fair scope rule "favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise." *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289, 1294 (1993) (citation omitted).

¶ 18 The Explanatory Comment following the text of Rule 4003.5 reads, in part:

> ***Where the full scope of the expert's testimony is presented in the answer to interrogatories or the separate report, as provided in subdivisions (a)(1) and (2), this will fix the permissible limits of his testimony at the trial.*** But, if the inquirer limits his inquiry to one or more specific issues only, the expert is free to testify at trial as to any other relevant issues not included in the discovery. Therefore, what happens at the trial may depend upon the manner in which the expert is interrogated. The inquirer may be well advised to conduct his discovery broadly, by paraphrasing the language of 4003.5(a), which will require the expert to state all his opinions and grounds, thus preventing surprise testimony at trial concerning grounds never raised during the discovery.

Pa.R.C.P. 4003.5(c), cmt. (emphasis added). This comment "advises parties to make broad discovery inquiries in order to force all of the expert's proposed testimony into the report, and prevent surprise at trial." *Takes v. Metropolitan Edison Co.,* 440 Pa.Super. 101, 655 A.2d 138, 145 (1995), *rev'd in part on other grounds,* 548 Pa. 92, 695 A.2d 397 (1997). The record reveals that Defendant framed her interrogatories broadly, as suggested by the above comment. In response, Plaintiff submitted the reports of Dr. Del Giorno, Dr. Whitlock, and Dr. Baskin. Accordingly, Defendant reasonably expected that Dr. Del Giorno's report would encompass all of his proposed testimony and that he would testify within

the fair scope of his report. *See* Pa.R.C.P. 4003.5(c), cmt.

¶ 19 No "hard and fast rule [exists] for determining when a particular expert's testimony exceeds the fair scope of his or her pre trial report," and we must examine the facts and circumstances of each case. *Mansour v. Linganna,* 787 A.2d 443, 445–46 (Pa.Super.2001) (quoting *Wilkes–Barre Iron & Wire Works, Inc., v. Pargas of Wilkes–Barre, Inc.,* 348 Pa.Super. 285, 502 A.2d 210, 212–213 (1985) (internal quotations and citations omitted)). In doing so, we must ask the overarching question, which is whether the purpose of Rule 4003.5 is being served. *Id.* We are guided by the following:

> [I]n determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." *The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.*

*Feden,* 746 A.2d at 1162 (citations and internal quotation marks omitted).

¶ 20 In the instant case, the trial court concluded that Dr. Del Giorno's testimony went beyond the fair scope of his report insofar as he testified to "his opinion regarding the causal relationship between the acute cervical radiculopathy as seen by Dr. Baskin on the EMG and the motor vehicle accident in question, stating that the cervical radiculopathy noted by Dr. Baskin was a result of the accident in question." Trial Court Opinion (T.C.O.), 8/22/02, at 6. However, the trial court further concluded that Defendant was not prejudiced or surprised by the admission of this testimony because she was in possession of the EMG report prior to trial and had adequate time to prepare a rebuttal. *Id.* We agree that the testimony went beyond the fair scope of his expert report, but we further conclude that Defendant was prejudiced and a new trial is warranted.

¶ 21 Under the facts and circumstances of this case, it is clear that Dr. Del Giorno testified beyond the fair scope of his reports, because the discrepancy between Dr. Del Giorno's reports and his subsequent testimony was of a nature that would prevent Defendant from making a meaningful response and would mislead Defendant as to the nature of the appropriate response. *Cf. Feden,* 746 A.2d at 1162. The trial court erred by permitting him to testify to matters concerning the EMG, including Dr. Baskin's impression that the EMG results were consistent with acute cervical radiculopathy, and "acute" infers that such injury was attributable to the June 1998 MVA. Trial Deposition, 10/3/01, at 30–33, 39–40. Indeed, these matters are completely absent from Dr. Del Giorno's reports. In his initial report, he merely indicated that Plaintiff sustained a neck injury in a prior MVA in October of 1997 "with some lingering neck pain and stiffness" but further indicated that such pain had *lessened.* Dr. Del Giorno's Initial Report, 6/26/98, at 1. The initial report does not include any diagnosis of cer-

vical injury related to the June 1998 MVA. In his final report, and contrary to statements in his initial report, he went a bit further and concluded that Plaintiff suffered exacerbated neck pain from the June 1998 MVA; however, he did not include any cervical injury as a final diagnosis. Dr. Del Giorno's Final Report, 6/26/98, at 1. Still, neither report includes a statement pertaining to cervical radiculopathy, or any related pain in Plaintiff's upper extremities, as had been indicated in the reports of Dr. Whitlock and Dr. Baskin. Moreover, Dr. Del Giorno's reports do not indicate that he relied on any tests, opinions, or impressions of other physicians including Dr. Whitlock and Dr. Baskin, in formulating his own opinions. Clearly, his testimony on these disputed matters went beyond the fair scope of his reports.

 ¶ 22 However, we must also determine whether the improper admission of Dr. Del Giorno's testimony caused Defendant harm or affected the verdict such that a new trial is warranted. *See Oxford Presbyterian Church*, 815 A.2d at 1099. As noted above, the fair scope rule "disfavors unfair and prejudicial surprise." *Jones*, 631 A.2d at 1294. We conclude initially that a new trial is warranted in this case because Defendant was deprived of the opportunity to adequately prepare for a meaningful response to Dr. Del Giorno's testimony, which was so clearly beyond the fair scope of his reports. Defendant submitted broadly phrased expert interrogatories and, upon receiving copies of Dr. Del Giorno's reports from Plaintiff in response to such interrogatories, was fully justified in expecting his testimony to remain within the fair scope of such reports.

¶ 23 Plaintiff argues that Defendant was aware of the EMG and diagnosis of cervi-

cal radiculopathy because Defendant was in possession of Dr. Whitlock's and Dr. Baskin's reports. However, Plaintiff did not present Dr. Whitlock or Dr. Baskin at trial. The only expert Plaintiff presented at trial was Dr. Del Giorno. Accordingly, Defendant proceeded on the reasonable assumption that the issues raised in their reports, and not included in Dr. Del Giorno's reports, would not be addressed at trial. *See Jones*, 631 A.2d at 1296–97 (concluding plaintiff was prejudiced by defendant's expert's testimony regarding "traction" theory of injury that occurred during gallbladder surgery, even though defendant himself made vague references to such theory at his deposition a year prior to trial). *Cf. Boyce v. St. Paul Prop. and Liability*, 421 Pa.Super. 582, 618 A.2d 962, 968 (1992) (concluding there was no surprise to defendant insurer when plaintiff's expert testified about permanency of plaintiff's injuries because, even though permanency of injuries not included in his report, *same* expert testified at two prior depositions about permanency of injuries). Defendant was prejudiced because she lacked sufficient notice that **Dr. Del Giorno,** as the only expert called at trial, would testify about the findings and diagnoses of other physicians to whom he made no reference in his own reports. *See Brady*, 704 A.2d at 1079.

¶ 24 Had Defendant expected the issues of the EMG and related matters to arise at trial, she would have had an opportunity to plan her defense accordingly. For example, she may have presented her own expert to rebut the testimony of Dr. Del Giorno or the findings of Dr. Whitlock and Dr. Baskin. In *Walsh v. Kubiak*, 443 Pa.Super. 284, 661 A.2d 416, 421 (1995), we concluded that the trial court did not err by prohibiting the defendant/physician's expert to testify about the necessity of

surgery performed on the plaintiff because the expert's pre-trial report made no mention of the necessity of the surgery even though plaintiff presented this issue prior to trial. We further concluded that, had this testimony been admitted, plaintiff would not have been able to adequately prepare to cross-examine the defendant's expert because the plaintiff's own expert, who could have assisted in formulating a rebuttal, had already testified and been dismissed as a witness. *Id.* Similarly, in the instant case, Defendant suffered prejudice by not having an adequate or fair opportunity to formulate rebuttal and present her own expert to counter the testimony of Dr. Del Giorno. Considering the overarching purpose of Rule 4003.5, including discouraging the use of "fudging" reports to gain tactical surprise, thereby stripping the adversary of the opportunity to adequately prepare for rebuttal, we must remand for a new trial.

¶ 25 Defendant also argues that Dr. Del Giorno's testimony about the EMG and related findings of Dr. Whitlock and Dr. Baskin constitute inadmissible hearsay. Hearsay evidence is "in-court evidence of an out-of-court declaration, whether oral or written, which is offered to show the truth of the out-of-court assertion." *Rafter v. Raymark Indus., Inc.,* 429 Pa.Super. 360, 632 A.2d 897, 899 (1993).

¶ 26 As an exception to the rule against hearsay, "[i]t is well understood that medical experts are permitted to express opinions which are based, in part, upon reports which are not in evidence, but which are customarily relied upon by experts in the practice of the profession." *Primavera v. Celotex Corp.,* 415 Pa.Super. 41, 608 A.2d 515, 518–19

(1992). We recognize that a physician will often base his or her diagnosis on information obtained through other sources such as statements from patients, nurses' reports, hospital records, and laboratory tests. *Id.* at 520. "The fact that experts reasonably and regularly rely on this type of information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes." *Id.* "[W]hen the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." *Id.* (quoting *United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir. 1971)).

¶ 27 However, an expert may not act as a "mere conduit or transmitter of the content of an extrajudicial source." *Id.* at 521.

An "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination. The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where ... the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience,

we conclude that the expert's testimony should be permitted.

*Id.* at 521 (footnote omitted).

¶ 28 The trial court concluded that Dr. Del Giorno's testimony with regard to the EMG should have been excluded as hearsay. T.C.O. at 8. Nevertheless, the trial court determined that a new trial was not warranted because Defendant conducted an adequate cross-examination of Dr. Del Giorno and was, therefore, not harmed by admission of this testimony. *Id.* at 9.

 ¶ 29 We agree that the testimony was hearsay, but we further conclude that Defendant was prejudiced. Our review of the disputed testimony reveals that Dr. Del Giorno merely parroted the findings and impressions of Dr. Whitlock and Dr. Baskin with regard to the EMG test. Moreover, we cannot agree with the trial court that Defendant's counsel's adequate cross-examination of Dr. Del Giorno is dispositive of a lack of prejudice. The fact remains that Defendant was not afforded the opportunity to cross-examine Dr. Whitlock and Dr. Baskin and, in turn, the jury did not have the opportunity to assess their credibility or qualifications. *See Allen v. Kaplan*, 439 Pa.Super. 263, 653 A.2d 1249, 1251 (1995). Moreover, as Defendant notes in her brief, had she known that Dr. Del Giorno would have testified about the EMG and related findings of Dr. Whitlock and Dr. Baskin, she may have called her own expert to rebut such findings and/or may have conducted an independent medical examination of Plaintiff.

¶ 30 In conclusion, we reiterate that "[w]hen improperly admitted testimony *may* have affected a verdict, the only correct remedy is the grant of a new trial." *Oxford Presbyterian Church*, 815 A.2d at 1099 (emphasis added). It is reasonable to conclude that the amount of damages awarded by the jury may have been far less had the testimony not been admitted. The testimony created the inference that Plaintiff suffered more extensive injuries as a result of the June 1998 MVA, *i.e.* acute cervical radiculopathy. Additionally, Dr. Del Giorno's statement that Plaintiff could not influence the results of the EMG bolstered Plaintiff's credibility with regard to her injuries, without a fair opportunity afforded to Defendant to challenge the EMG testing as by, for example, cross-examining Dr. Baskin. Finally, admission of the testimony at issue undermined the purposes of the fair scope rule and the rule against hearsay. If we did not remand for a new trial, as in the circumstances presented herein, we would be essentially encouraging litigants to violate these important evidentiary rules in the hopes that, in the absence of prejudice, they would be successful in gaining a tactical advantage through the element of surprise, thereby stripping an opposing party of his or her opportunity to adequately prepare for rebuttal.

¶ 31 For the foregoing reasons, we conclude the trial court erred by refusing to grant Defendant's post trial motion for a new trial. Accordingly, we reverse and remand for a new trial.

¶ 32 Order reversed. Case remanded. Jurisdiction relinquished.