J. A32036/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

MARGARET DEFRANCESCO AND DAVID : IN THE SUPERIOR COURT OF
WEISS, CO-ADMINISTRATORS OF THE : PENNSYLVANIA
ESTATE OF DEVIN WEISS, DECEASED, :
:
               Appellants : 
:
              v. :
:
LEHIGH VALLEY HEALTH NETWORK, INC. :
A/D/B/A LEHIGH VALLEY HEALTH :
NETWORK; LEHIGH VALLEY HOSPITAL- :
MUHLENBERG, INC.; JOHN PETTINE, M.D., :
MUHLENBERG PRIMARY CARE; SUSAN :
KRIEG, M.D. AND LEHIGH VALLEY :
PHYSICIAN GROUP : No. 742 EDA 2014

Appeal from the Order January 31, 2014
In the Court of Common Pleas of Lehigh County
Civil Division No(s).: 2011-C-4318

BEFORE: PANELLA, OLSON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED MAY 26, 2015**

Plaintiff/Appellants, Margaret DeFrancesco and David Weiss, co-Administrators of the estate of Devin Weiss, Deceased ("Decedent") (DeFrancesco and Weiss collectively, "Estate"), appeal from the judgment entered in the Lehigh County Court of Common Pleas after a jury trial, in favor of all defendants/Appellees, Lehigh Valley Health Network, Inc. a/d/b/a Lehigh Valley Health Network; Lehigh Valley Hospital-Muhlenberg, Inc.; John Pettine, M.D., Muhlenberg Primary Care; Susan Krieg, M.D. and Lehigh

---

[*] Former Justice specially assigned to the Superior Court.

Valley Physician Group. In this medical malpractice matter, the Estate argues the trial court erred in: (1) refusing to strike a potential juror for cause; (2) precluding the Estate from impeaching defense witnesses with a textbook chapter written by defense expert Dr. Bavaria; and (3) precluding the Estate's expert witness, Dr. Gasirowski, from testifying about symptoms of aortic dissection and GERD because they were beyond the scope of his report. We affirm.

The following underlying facts are generally undisputed. On January 3, 2010, Decedent, who was thirty-six years old, presented at the emergency department of Appellee Lehigh Valley Hospital-Muhlenberg, Inc. ("Hospital") with complaints of chest pain. An emergency department physician, Appellee Susan Krieg, M.D., evaluated him, diagnosed atypical chest pain and gastroesophageal reflux ("GERD"), and discharged him. Decedent was at the hospital for approximately two hours.[1]

Three days later, on January 6, 2010, Decedent presented to Muhlenberg Primary Care, P.C. with complaints of continued chest pain. Appellee John Pettine, M.D., evaluated Decedent and diagnosed esophageal

---

[1] N.T. Amended Notes of Testimony, 9/18/13, at 177 (direct examination testimony of Appellee Krieg). The certified record includes two transcripts dated September 18, 2013, one entitled "Notes of Testimony" and stamped "Filed" on December 9, 2013, and the second entitled "Amended Notes of Testimony" and stamped "Filed" on December 20, 2013. Henceforth, our citations to the September 18, 2013 volume are to the Amended Notes of Testimony.

spasm. The next day, January 7th, Decedent died from a ruptured aortic dissection.

On November 30, 2011, Appellants, who are Decedent's parents, commenced the instant negligence action against Appellees Dr. Krieg, Dr. Pettine, Hospital, and Lehigh Valley Physician Group.[2] Their theory of the case was that both doctors mis-diagnosed Decedent and should have instead diagnosed him with aortic dissection.

The case proceeded to a nine-day jury trial on September 16, 2013. On September 27th, the jury announced its verdict, finding none of the Appellees/defendants negligent. The Estate filed a post-trial motion, which the trial court denied. The court entered judgment in favor of all defendants on February 25, 2014, and the Estate took this timely appeal.[3]

In their first issue, the Estate avers the trial court abused its discretion in denying its request to strike a potential juror for cause.[4] For context, we summarize the following. During *voir dire*, one juror revealed he had a pending estate matter with an Attorney Capehart of the law firm of Gross

---

[2] Appellants also named as defendants Lehigh Valley Health Network, Inc. and Muhlenberg Primary Care, P.C. but subsequently dismissed their claims against them.

[3] The trial court did not direct the Estate to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal.

[4] For ease of discussion we henceforth refer to this potential juror simply as "the juror."

McGinley, LLP. **See** N.T., 9/16/13, at 69-70.[5] Another attorney in that firm, Howard S. Stevens, Esq., was representing Appellees Dr. Krieg and Hospital.[6] The Estate moved to strike the juror for cause. **Id.** at 69.

Attorney Stevens responded with the following. He practiced in the firm's Allentown office and had "nothing to do with estate work" and the other attorney, Attorney Capehart, practiced in the Emmaus office and had "nothing to do with any of [Attorney Stevens'] work." **Id.** at 70. Attorney Stevens "informed the prospective juror [he did not] have anything to do with [the juror's] case" and that Attorney "Capehart [did not] have anything to do with" the instant case. **Id.** According to Attorney Stevens, the juror "said that wouldn't be a problem for him." **Id.** at 71.

The trial court then called the juror to continue *voir dire*. **Id.** at 75. In response to the court's questioning, the juror stated: (1) his case with Gross McGinley LLP was not a medical malpractice case; (2) he had previously never met or heard of Attorney Stevens;[7] (3) Attorney Capehart had previously never talked about Attorney Stevens; and (4) to the juror's

---

[5] The initial *voir dire* proceeding was not transcribed. The transcript cited above, dated September 16, 2013, is of the Estate's oral motion to strike the juror for cause and the parties' ensuing argument.

[6] Gross McGinley, LLP continues to represent Appellees Hospital and Dr. Krieg on appeal.

[7] Attorney Stevens informed the court that his firm's letterhead includes his name. N.T., 9/16/13, at 77. However, the juror stated he never noticed Attorney Stevens' name. **Id.**

knowledge, Attorney Stevens had not worked on his—the juror's—case, and no other attorneys beside Attorney Capehart had worked on his case. *Id.* at 75-76. The following exchange then occurred:

> [Court:] Does the fact that Mr. Stevens is in this case and also in the same firm with the lawyer that you picked to represent you, does that tend to give you any more—like, would you give Attorney Stevens more credibility or somehow side with him because you think he's in the same firm with the guy that I picked, so he must be good; something like that?
>
> [Juror:] No, I don't think so. No.
>
>          \*     \*     \*
>
> [Court:] Does the fact that Attorney Stevens will be in this case cause you to have any concerns about your ability to be fair?
>
> [Juror:] No.
>
> Q      Okay. Do you feel that you could be fair and impartial in this case?
>
> A      I feel, yeah.
>
> Q      Are you sure?
>
> A      Yeah.

*Id.* at 77-78.

Following this exchange, the Estate argued the juror was "still a present client of Mr. Stevens' law firm" and thus "affiliated with this firm." *Id.* at 79, 81. The court, however, agreed with Attorney Stevens that "the issue is whether he can be fair and impartial" and denied the Estate's motion to strike the juror. *Id.* at 81-83. The Estate exercised a peremptory strike

against the juror, and thus the juror did not participate in the trial.

On appeal, as stated above, the Estate avers the court abused its discretion in denying its motion to strike the juror. The Estate maintains the juror and Gross McGinley, LLP had an attorney-client relationship and thus "every lawyer," including Attorney Stevens, "who works for Gross McGinley" "owed duties of loyalty, care, and confidentiality to the prospective juror." Estate's Brief at 17. The Estate contends the court's "failure to strike [the] juror" created the "appearance of bias (if not the reality) because of the possibility that the juror could be unduly influenced by the arguments made by his own law firm." *Id.* at 18. Furthermore, the Estate challenges each of the trial court's stated reasons for denying its motion to strike—that the juror did not know Attorney Stevens, "that the out-of-state cases cited by the [Estate were] distinguishable on their facts," and that the automatic striking of "all . . . clients of a firm with dozens of attorneys in multiple cities" is overbroad. *Id.* at 22-23. Finally, the Estate alleges the court's ruling was not harmless error because the Estate "was forced to use a peremptory strike to remove the juror[ and thus] lost the ability to use that peremptory strike on another prospective juror." *Id.* at 26-27. We find no relief is due.

We note the relevant standard of review:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on

the basis of answers to questions and demeanor . . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice[,] or demonstrates a likelihood of prejudice by his or her conduct and answers to questions.

. . . In the first situation, in which a juror has a close relationship with a participant in the case, "the determination is practically one of law and[,] as such[,] is subject to ordinary review."[ ] . . . When presented with a situation in which a juror has a close relationship with participants in the litigation, we presume prejudice for the purpose of [en]suring fairness.

**McHugh v. P&G Paper Prods. Co.**, 776 A.2d 266, 270 (Pa. Super. 2001) (citations omitted).[8]

The Estate avers "[n]o Pennsylvania case addresses whether a prospective juror must be struck based on an ongoing attorney-client relationship with a party's attorney." Estate's Brief at 19. We discern the issue before us to be more exacting: whether a trial court should strike a juror for cause when the juror has a different type of matter—in this case,

---

[8] The Estate relies extensively on the 2014 Superior Court *en banc* decision in **Cordes v. Assocs. of Internal Med.**, 87 A.3d 829 (Pa. Super. 2014) (*en banc*). Estate's Brief at 12-16. However, there was no majority decision in that case. Instead, the eight-member *en banc panel* was split as follows: (1) Judge Wecht wrote an opinion in support of reversal, with one judge joining and two judges concurring in the result; **Cordes**, 87 A.3d at 831; (2) Judge Olson wrote a dissenting opinion, with one judge joining, **id.** at 847; and (3) Judge Donohue wrote another opinion in support of reversal, with two judges joining and one judge concurring in the result. **Id.** at 863. Accordingly, none of the analysis in **Cordes** is not binding authority. Nevertheless, some of the law set forth in **Cordes**—for example the relevant standard of review—applies in this matter.

an estate case where the trial is in medical malpractice—handled by an attorney working in a different office of the same law firm as one of the attorneys at trial. Nevertheless, we agree there is no Pennsylvania decision directly on point.

In **_Linsenmeyer v. Straits_**, 166 A.2d 18 (Pa. 1960), our Supreme Court addressed the striking of potential jurors, in sum, as follows:

> [The defendant's] next allegation is that the trial judge erred in refusing to sustain certain of defendant's challenges for cause. These challenges were made because certain prospective jurors knew some of plaintiff's counsel and had had in the past some legal relationship with the firm of counsel which represented plaintiff.[FN] We do not find on this record any evidence to justify a finding that by reason of such relationships any of the prospective jurors were disqualified. **The trial judge—in a much better position to evaluate the situation than this Court because he saw the prospective jurors and heard their responses on _voir dire_**—found no reason to justify a belief that these jurors by reason of their prior relationship with one or more of [the plaintiff's] counsel would thereby be unable to fairly try the issue between [the parties]. **In this area of the law, wide latitude is given to the discretion of the trial judge and, absent any showing that the trial judge abused his discretion in this respect, his action must be sustained**[.]
>
> ---
>
> [FN] Five jurors were challenged for cause. Three of the jurors had been clients of the law firm representing [the plaintiffs]; one juror was an "old friend" **presumably** of one of [the plaintiff's] lawyers; one juror came from the same village as one of [the plaintiff's] lawyers and knew him. The court labeled the relationship of the latter two jurors as that of "acquaintance" and noted the legal relationship of the other three jurors was "not recent."

**_Id._** at 22-23 & n.2 (citations omitted) (first & second emphases added).

The Estate contends that decisions from our sister states "have addressed this issue compellingly." Estate's Brief at 19. We decline to consider those foreign decisions and instead find the principles, enunciated above, in **McHugh**, 776 A.2d 266, and **Linsenmeyer**, 166 A.2d 18, provide sufficient guidance in the case *sub judice*.

We first distinguish a salient fact in **Linsenmeyer**. In that case, the potential jurors were past, "not recent" clients of the plaintiff's attorneys, whereas in the instant case, the potential juror was a current client of the same law firm which represented Appellees Dr. Krieg and Hospital. **Linsenmeyer**, 166 A.2d at 23 & n.2. Nevertheless, we emphasize that in this case, the juror had an estate matter with an attorney in the Emmaus office of the firm, whereas the instant case sounded in medical malpractice and Attorney Stevens worked in the Allentown office. N.T., 9/16/13, at 70. Attorney Stevens averred he informed the juror specifically he did not work on his estate matter, and that Attorney Capehart had no connection to the instant case. *Id.* The juror stated he had never heard of Attorney Stevens and believed only Attorney Capehart was working on his estate case. *Id.* at 75-76. Importantly, the juror also stated, in direct response to the trial court's questioning, he would not give Attorney Stevens more credibility, and that his—the juror's—ability to be fair and impartial was not affected. *Id.* at 77, 78.

We consider that "[t]he test for determining whether a prospective

juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor." **McHugh**, 776 A.2d at 270. In light of the trial court's "wide latitude" and our standard of review, we disagree that the court abused its discretion. **See Lisenmeyer**, 166 A.2d at 23. After reviewing the circumstances before us, we disagree with the Estate that the juror had "such a close relationship, familial, financial, or situational, with" Attorney Stevens. **See McHugh**, 776 A.2d at 270. Furthermore, we agree with the trial court that the juror did not "demonstrate[ ] a likelihood of prejudice by his . . . conduct and answers to questions." **See id.**

Finally, "we note that this is not a situation where the complaining party exhausted its preemptory challenges, the trial court failed to strike a juror for cause, and the impermissible juror sat on the jury." **See Lockley v. CSX Transp., Inc.**, 5 A.3d 383, 391 (Pa. Super. 2010). Instead, the Estate exercised its peremptory strike and thus this juror did not participate in this trial. In light of our above discussion, the Estate's claim that it "lost the ability to use that peremptory strike on another prospective juror" does not dissuade us from our holding.[9] **See** Estate's Brief at 26. Accordingly,

---

[9] "The primary function of a peremptory challenge is to allow parties to strike prospective jurors whom they have good reason to believe might be biased but who are not so clearly and obviously partial that they could

we do not disturb the trial court's ruling.

The Estate's second issue on appeal concerns whether certain symptoms of aortic dissection and GERD were within the "fair scope" of an expert report. The Estate presented an expert witness on emergency medicine, Ben Gasirowski, M.D.,[10] who, prior to trial, had prepared a report in the form of a three-page opinion letter. For ease of disposition, we first summarize the report, with particular detail to the symptoms set forth in it.

The report specified Decedent's symptoms at the time he presented to Appellee Dr. Krieg at the emergency department: chest pain "which started in his neck with radiations to his back," "tightness in the center of his chest with pain radiating to the upper back," "a history of constant chest pain, tightness in character, waxing and waning, which initially began in his neck, and then went to his chest and back," "active chest pain in his central chest (substernal area), with radiations of pain to his upper back," "shortness of breath and nausea." Ltr. of Ben Gasirowski, 1/26/13, at 1, 2. Decedent's "symptoms began around 8:30 a.m. while waking."[11] *Id.* at 1. Dr. Gasirowski opined Decedent's "symptoms were consistent with those of

---

otherwise be excluded from the panel." *Bruckshaw v. Frankford Hosp. of Phila.*, 58 A.3d 102, 112 (Pa. 2012).

[10] *See* N.T. Trial, 9/19/13, at 18.

[11] The report also noted Decedent "had known cardiac risk factors of hyperlipidemia and smoking (quit several years ago, but less than 10 years). There was no evidence for a musculoskeletal or pleuritic origin of [Decedent's] symptoms." Ltr. of Gasirowski at 2.

[acute coronary syndrome] and potentially an aortic dissection, particularly in the latter because of the interscapular radiation of pain." ***Id.***

Dr. Gasirowski further identified **general** symptoms of aortic dissection: "Although the chest pain of aortic dissection is often described as severe and unremitting, it can also be intermittent. It can also be pain free and asymptomatic." ***Id.*** at 2. Dr. Gasirowski did not identify any symptoms of GERD but instead stated: "Although [GERD] may present with some similar features as cardiac conditions, without clear evidence for reflux disease, the more serious and life threatening cardiac conditions need to take precedence." ***Id.*** at 3.

Dr. Gasirowski's report opined the standard of care required Dr. Krieg to: (1) evaluate Decedent for acute coronary syndrome and aortic dissection; (2) "administer aspirin . . . and sublingual nitroglycerin . . . for [Decedent's] complaints of chest pain with radiations to his upper back (interscapular area) that were not musculoskeletal or pleuritic in origin;" (3) admit Decedent, order "an [acute coronary syndrome] rule out protocol [sic] and objective cardiac testing;" and (4) if acute coronary syndrome were "ruled out," then "absolutely" "rule[ ] out" aortic dissection "with a CTA and/or TEE before"[12] discharging Decedent with a diagnosis of GERD.[13] ***Id.***

---

[12] The terms "CTA" and "TEE" are not defined in Dr. Gasirowski's report.

[13] Dr. Gasirowski noted "Dr. Krieg did believe [Decedent] may have been having an acute coronary syndrome [sic] as was discussed in her

at 2. Dr. Gasirowski further opined that because Dr. Krieg did not undertake any of these actions, her conduct fell below the standard of care.[14] *Id.* at 2-3.

During trial, Appellees Dr. Krieg and Hospital filed a motion *in limine* to preclude Dr. Gasirowski from testifying about symptoms of aortic dissection and GERD that were not contained in his expert report.[15] Specifically, the motion sought to preclude testimony about these symptoms of aortic dissection: (1) anxiety and/or apprehension, (2) the sudden onset of chest pain, (3) a difference in pulses in the arms and legs, and (4) a difference in blood pressure in the arms. The motion also sought the preclusion of testimony about these symptoms of GERD: (1) a "[h]istory or lack thereof of heartburn," (2) a regurgitation reflux, (3) food intolerance, (4) esophageal spasms, and (5) use of antacids. Appellees Susan Krieg & Hospital's Mot. *in Limine*, 9/19/13, at 3. Appellees relied on Pennsylvania Rule of Civil Procedure 4003.5 and argued these symptoms were not included in the four

---

deposition," and had "instructed [Decedent] to schedule an outpatient stress test with his primary care doctor '[the following] week.'" Ltr. of Gasirowski at 3.

[14] Dr. Gasirowski further concluded "within a reasonable of medical certainty," that "had [Decedent] been admitted . . . the admitting team and cardiology consult would have considered aortic dissection as a possibility[,] the appropriate imaging, diagnosis and treatment for aortic dissection would have ensued[,]" and Decedent "would have had a reasonable chance of recovery." *Id.* at 3.

[15] N.T. Trial, 9/19/13, at 20-21.

corners of the report. N.T., 9/19/13, at 48. The trial court granted the motion.

In the instant appeal, the Estate avers the court abused its discretion in granting Appellees' motion. It maintains a central issue at trial was whether Dr. Krieg misdiagnosed Decedent's symptoms as GERD and all parties "were prepared to address that issue at trial." Estate's Brief at 33, 34. The Estate contends "Dr. Gasirowski addressed exactly that issue in his report"—that Dr. Krieg should have "consider[ed] and rule[d] out aortic dissection before" discharging Decedent with a GERD diagnosis. *Id.* at 33. It reasons "[t]he fair scope doctrine does not require experts to compose an exegesis on the subject at issue," but simply "asks whether the proposed testimony was within the 'fair scope' of the report." *Id.* The Estate concedes "Dr. Gasirowski did not specify in writing the particular signs and symptoms of GERD and aortic dissection," but alleges "those particulars were not 'beyond the fair scope' of his report such that Dr. Krieg would have experienced 'unfair surprise.'" *Id.* The Estate avers the trial court overly "criticize[d] the level of detail that Dr. Gasirowski wrote into his report." *Id.* ("This nit-picking does not provide a sufficient basis for precluding testimony under the fair scope doctrine."). *Id.* Finally, the Estate claims prejudice because it was "prevented from presenting basic evidence on a basic issue" and the jury could not "meaningfully understand the particulars regarding how Dr. Krieg committed negligence by assuming [Decedent] was experiencing GERD

without ruling out aortic dissection."[16]  ***Id.*** at 34, 35.  After careful review,

we find no relief is due.

This Court has stated:

> "[T]he admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion."  If the trial court made an erroneous evidentiary ruling that caused harm to the complaining party, the only remedy is to grant a new trial. . . .
>
> Pursuant to Pa.R.C.P. 4003.5(a)(1)(B), "a party may, during discovery, require his adversary to state the substance of the facts and opinions to which his or her expert is expected to testify and a summary of the grounds for each opinion."  "The purpose of this provision is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony."  The fair scope rule, addressed specifically in Pa.R.C.P. 4003.5(c), "provides that an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate report."[17] . . .

---

[16] Furthermore, the Estate cites the "court's un-evenhanded" ruling on another evidentiary issue: allowing Appellee's expert on causation, Dr. Bavaria, to testify about Decedent's "life expectancy with a level of detail far beyond what Dr. Bavaria wrote in his report."  Estate's Brief at 35-36 (citing N.T., 9/25/13, at 217-19, 248-58).

[17] That subsection of the Rule states:

> To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto.  However, the expert shall not be prevented from

\* \* \*

The purpose of this rule is "to prevent incomplete or 'fudging' of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor." Pa.R.C.P. 4003.5(c), *cmt*. In other words, the fair scope rule " . . . disfavors unfair and prejudicial surprise."

\* \* \*

No "hard and fast rule [exists] for determining when a particular expert's testimony exceeds the fair scope of his or her pre trial report," and we must examine the facts and circumstances of each case. In doing so, we must ask the overarching question, which is whether the purpose of Rule 4003.5 is being served. We are guided by the following:

> In determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." **The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.**

*Woodard v. Chatterjee*, 827 A.2d 433, 440-42 (Pa. Super. 2003) (some

---

testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5(c).

- 16 -

citations omitted).

In the instant matter, the trial court opined:

> [T]he court examined Dr. Gasirowski's relatively brief three (3) page report. The report did discuss the symptoms with which the decedent presented, including chest pain going to his back, shortness of breath, and nausea. Dr. Gasirowski then drew the conclusion that these symptoms were consistent with aortic dissection and acute coronary syndrome. He made no mention of the other symptoms that the decedent had or that a person with aortic dissection would have. . . .
>
> The court found [the Estate was] attempting at trial to add factors that were not referenced in [its] expert's report and did not reasonably flow from that report and that, thus, [Appellees] had no notice that they would have to be prepared to defend on those points. Dr. Gasirowski drafted his report and made broad conclusions about the standard of care based on symptoms with which [Decedent] presented, but did not list any reason or other symptoms showing this was insufficient. The entire focus of the expert report is on the patient's symptoms and the standard of care with regard to those symptoms.
>
> [Appellees] received no notice from [the Estate] that this expert intended to opine as to other alleged symptoms of this condition and to permit him to do so in these circumstances would encourage experts to write short, broad reports so that they could later explain them in any way that fits their party's theory of the case. The Court concludes that is not consistent with the rules of evidence and case law as to expert reports and the four corners of the report doctrine. The court allowed Dr. Gasirowski to testify in a manner consistent with his report which established his belief that [Appellee's] care fell below the professional standard of care. This does not constitute a gross abuse of discretion which would merit a new trial.

Trial Ct. Op., 3/20/14, at 11-12 (citing Ltr. of Gasirowski at 2) (paragraph breaks added).

Implicit in the Estate's theory of the case—that Dr. Krieg was negligent in failing to diagnose Decedent with aortic dissection and instead with GERD—is that the symptoms of GERD and aortic dissection are distinct.[18] We emphasize, as the Estate concedes on appeal, that Dr. Gasirowski's report made no mention of the symptoms of GERD, and listed only these general symptoms of aortic dissection: chest pain, which can be "severe and unremitting" or "intermittent" or "pain free [sic] and asymptomatic." **See** Ltr. of Gasirowski at 2. We thus reject the Estate's argument that the symptoms of GERD were within the fair scope of a report that identified: (1) some general symptoms of aortic dissection, and (2) the symptoms Decedent was suffering when he was evaluated by Dr. Krieg. We likewise find no relief due with respect to the other symptoms of aortic dissection the Estate sought to elicit from Dr. Gasirowski at trial—namely, anxiety, apprehension, "[t]he difference between the pulses in the arms and the legs; and . . . [b]lood Pressure differences between the arms." **See** Appellee's Mot. *in Limine* at 3. As stated above, the report only discussed chest pain as a symptom of aortic dissection. The remaining symptom that the court precluded—a "[s]udden onset of chest pain"—could be related to the report's

---

[18] **See** Ltr. of Gasirowski at 2 ("Although [GERD] may present with some similar features as cardiac conditions, without clear evidence for reflux disease, the more serious and life threatening cardiac conditions need to take precedence."); Estate's Brief at 33 ("Here, a central issue at trial was whether Dr. Krieg had misdiagnosed [Decedent] as experiencing signs and symptoms of GERD rather than those of aortic dissection.").

discussion of chest pain. *See id.* Nevertheless, we find the court's preclusion of this symptom did not arise to an abuse of discretion, where the sudden onset of chest pain is a distinct concept from chest pain being severe, unremitting, or intermittent. In sum, we disagree with the Estate's characterization of the omission of GERD symptoms and the additional aortic dissection symptoms as merely a matter of "level of detail." *See* Estate's Brief at 33. Accordingly, we do not disturb the court's evidentiary ruling.

Appellant's final issue on appeal is a challenge to the trial court's precluding it from impeaching defense witnesses with a textbook chapter written by one of the defense's expert witnesses. We set forth the following background. Prior to trial, the parties stipulated they would not "use any of the cardiothoracic surgeons for any crossover standard of care opinions" and instead "would each be limited to [their] emergency room and/or internal medicine experts with regard to [those] particular specialt[ies]." N.T., 9/18/13, at 129-30 (Appellees Dr. Krieg and Hospital's argument); *see also id.* at 150 (Estate's argument); Trial Ct. Op. at 8. Appellee Dr. Krieg would call Joseph Bavaria, M.D., a cardiothoracic surgeon, as an expert on causation. Dr. Bavaria had co-authored a chapter, entitled *Aortic Dissection*, in a textbook, *Mastery of Cardiothoracic Surgery.* The chapter "dealt with the diagnosis of aortic dissection," *id.* at 9, including diagnosis in "young patients who presented with classic symptoms of aortic dissection without significant risk factors for atherosclerotic disease." Estate's Brief at 40.

Appellees filed a motion *in limine* to preclude the Estate from cross-examining Dr. Bavaria, as well as any other defense witness, with the chapter. The court heard extensive argument during the course of trial, out of the jury's presence. N.T., 9/18/13, at 127-61. Appellees Dr. Krieg and Hospital argued the Estate would attempt to circumvent the stipulation by referring to the chapter, which included standard of care opinions. *Id.* at 130-31. The Estate denied it would attempt to offer a standard of care opinion through Dr. Bavaria's testimony or present the chapter itself as evidence. *Id.* at 150. Instead, the Estate averred, it would "use his learned treatise as means of impeachment in cross-examination on other witnesses." *Id.* The Estate further argued that in deposition, Dr. Bavaria stated cardiothoracic "surgeons do not diagnose aortic dissection," but instead a patient has already had a "CT scan or the TEE" and "comes to the [cardiothoracic] surgeon with a diagnosis of aortic dissection." *Id.* at 151. The Estate then argued that emergency room physicians, as well as primary care physicians, diagnose "aortic dissection and that's the purpose for which [the chapter] will be offered on cross-examination of" the defense witnesses. *Id.* at 152-53.

The trial court granted Appellees' motion to preclude the chapter. *Id.* at 167. It reasoned, *inter alia*, "The question is, can a cardiothoracic surgeon say what is authoritative for an ER doctor or an internist." *Id.* at 166. The court found the those fields were different: "You can't hold an

internist or ER doctor to the same level of training and education that we hold a cardiothoracic surgeon [to.]" *Id.*

On appeal, the Estate acknowledges the parties' stipulation and reiterates its argument that it was merely "attempt[ing] to use [the] treatise for impeachment purposes," pursuant to ***McDaniel v. Merck, Sharp & Dohme***, 533 A.2d 436 (Pa. Super. 1987). Estate's Brief at 38. The Estate maintains, "[T]he practice described by [the chapter,] *Aortic Dissection*[,] regarding the evaluation of a patient with suspected aortic dissection—obtaining a CT scan—is a standard of care that applies directly to any physician, but especially emergency medicine physicians, evaluating a patient with recent onset of sudden chest pain, and not uniquely to cardiothoracic surgeons." *Id.* at 50-51. The Estate further states, "Section 512 of the Mcare Act[19] does not impose a strict 'same specialty' requirement regarding standard of care experts," but instead allows an expert to provide standard of care testimony where the expert . . . (a) is substantially familiar with the applicable standard of care 'for the specific care at issue,' and (b) practices in a subspecialty that has 'a substantially similar standard of care for the specific care at issue.'" *Id.* at 51. We find no relief is due.

Section 512 of the MCARE Act provides:

> § 1303.512. Expert qualifications

---

[19] Medical Care Availability and Reduction of Error Act, 40 P.S. §§ 1303.101-1303.910.

**(a) General Rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

**(b) Medical Testimony.**—. . .

\* \* \*

[H]owever, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard Of Care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) Care Outside Specialty.**—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

>(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.
>
>**(e) Otherwise Adequate Training, Experience And Knowledge.—**A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512(a)-(e).

The Estate argues on appeal that although Dr. Bavaria would not testify about the standard of care applicable to **cardiothoracic surgeons**, he could testify about the standard of care applicable to **emergency department physicians** making diagnoses of aortic dissection. However, we agree with the trial court that, per the stipulation, a cardiothoracic surgeon could not "say what is authoritative for an ER doctor or an internist." *See* N.T., 9/18/13, at 166. Furthermore, we disagree with the Estate's claim that Dr. Bavaria could testify about an emergency department physician's standard of care under Section 512. Subsection 512(c) requires that for an expert to testify about a physician's standard of care, the expert must be "substantially familiar with the applicable standard of care" **and** "[p]ractice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue." 40 P.S. § 1303.512(c)(1)-(2). While the Estate's emphasizes that

J. A32036/14

Dr. Bavaria characterized his chapter as "a reliable authority for the purpose of treating and diagnosing aortic dissection," Estate's Brief at 151-52, we disagree that the record shows he was, pursuant to Subsection 512(c), "substantially familiar with the applicable standard of care" for emergency room physicians or that his specialty, cardiothoracic surgery, was a subspecialty of emergency medicine. *See id.* Accordingly, we agree with the trial court that Dr. Bavaria could not testify about the standards of care applicable to Appellees Dr. Krieg or Dr. Pettine.

Finding no grounds for relief, we affirm the judgment entered by the trial court in favor of all defendants.

Judgment affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2015

- 24 -