**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 366 EDA 2022 |

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000137-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 367 EDA 2022 |

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000137-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 368 EDA 2022 |

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000138-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S19031-22

APPEAL OF: K.M.K., MOTHER

:
:
:
:
:
:
:
:
:
:
:

No. 369 EDA 2022

Appeal from the Order Entered January 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000138-2021

BEFORE: PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED JULY 07, 2022**

K.M.K ("Mother") appeals from the January 14, 2022, orders entered in the Court of Common Pleas of Philadelphia County, Juvenile Division ("trial court"), adjudicating her children, N.M.M. (born in June of 2018) and M.M. (born in February of 2020) (collectively "the Children"), dependent after the trial court determined Mother was the perpetrator of abuse as to her infant, G.M., who died on June 16, 2020. Further, on January 14, 2022, the trial court entered orders finding that aggravated circumstances existed as to Mother.[1] After a careful review, we affirm.

---

* Former Justice specially assigned to the Superior Court.

[1] Mother filed a separate notice of appeal as to each child (N.M.M. and M.M.) for both trial court orders. The trial court also entered orders finding Father to be a perpetrator of child abuse as to G.M., as well as aggravated circumstances existed as to Father. Father filed separate notices of appeal, which are docketed in this Court at 426 EDA 2022 and 427 EDA 2022. This Court consolidated Father's appeals, which we shall address in a separate decision.

- 2 -

The trial court has aptly set forth the relevant facts and procedural history as follows:

The Philadelphia Department of Human Services ("DHS") first became aware of this family on June 17, 2018, when DHS received a General Protective Services ("GPS") report alleging that N.M.M. and Mother tested positive for marijuana at N.M.M.'s birth in June [of] 2018. The report alleged that Mother was the primary care provider for N.M.M. The GPS was determined to be valid.

On March 1, 2019, Community Umbrella Agency ("CUA") implemented In-Home Services in N.M.M.'s paternal grandparents' home where Mother resided. Mother was not compliant with CUA services, including failure to complete substance use assessments and parenting classes.

In February [of] 2020, Mother gave birth to twins, G.M. and M.M. The twins were born premature, weighed three (3) pounds, and had gastrointestinal issues. After spending several weeks in the hospital, G.M. and M.M. were discharged on March 26, 2020, to Mother's care. Mother never notified DHS or CUA that she was pregnant with G.M. and M.M. DHS and CUA did not learn of Mother's pregnancy or the twins' birth until June 16, 2020.

On June 16, 2020, DHS received a GPS report alleging that the Philadelphia Police Department ("PPD") was called to the family home at noon because G.M. was unresponsive. When paramedics arrived, G.M. was pronounced dead. On June 17, 2020, the Philadelphia Medical Examiner's Office ("M.E.") stated that G.M. had a healing rib fracture at the time of death.

On November 25, 2020, DHS received a Child Protective Services ("CPS") report stating that the June 17, 2020, M.E. report on G.M.'s death confirmed that G.M. had a healing rib fracture, and that based on the area of the fracture, it was consistent with child abuse. The M.E. could not confirm whether the rib fracture contributed to G.M.'s death. This report was indicated.

At the time of G.M.'s death, the Medical Examiner found that G.M. had a healing right posterior third rib fracture, which was consistent with inflicted trauma from child abuse. Additionally, the Medical Examiner noted that G.M. had a hemorrhage on the right side of her brain and a bilateral subdural hematoma. Mother admitted to M.E. investigators that G.M. also suffered a seizure[,] which lasted more than one minute, but she did not seek medical attention for G.M. The Medical Examiner stated that the seizure

could have been the result of the brain trauma G.M. suffered. Mother was unable to explain the cause of G.M.'s injuries.

On February 5, 2021, DHS received a CPS report stating that G.M.'s autopsy revealed that G.M.'s healing rib fracture occurred two to three weeks prior to G.M.'s death, and that intercranial hemorrhages were found in her brain. The report also alleged that G.M. was four months old at the time of her death. The CPS report alleged that G.M.'s head and rib injuries were sustained on different occasions. The report also alleged that the only explanation for G.M.'s head injury was inflicted trauma. While the cause and manner of G.M.'s death was "undetermined," the CPS report stated that G.M.'s injuries were indicative of child abuse.

On an unknown date, Mother and the Children, [N.M.M. and M.M.,] began residing with the Children's maternal uncle pursuant to a Safety Plan. On February 5, 2021, Mother and the Children moved to Pathways. That same day, DHS developed a Safety Plan stating that Pathways staff would ensure the safety of the Children and that their basic needs were met. This included 24-hour supervision of Mother and the Children. When DHS visited Mother at Pathways on February 8, 2021, Mother could not provide an explanation as to the cause of G.M.'s injuries. Mother stated that she and Father were G.M.'s primary caregivers. [On February 10, 2021, DHS filed dependency petitions as to N.M.M. and M.M. requesting that they be adjudicated dependent and committed to the custody of DHS, as well as that the trial court enter findings of child abuse and aggravated circumstances against Mother and Father based on G.M.'s unexplained injuries.] On February 27, 2021, CUA learned that Pathways was no longer able to monitor Mother and the Children to the extent necessary under the terms of the Safety Plan. That same day, DHS obtained an Order for Protective Custody ("OPC") for the Children and placed them in foster care. At the March 1, 2021, shelter care hearing, the [trial] [c]ourt lifted the OPC and ordered the temporary commitment to DHS to stand. The Children were subsequently placed in Kinship Care with their paternal grandmother.

On January 14, 2022, [the trial court] held an Adjudicatory and Child Abuse hearing for [N.M.M. and M.M.[2]]. Counsel for DHS

_____

[2] We note Mother and Father were both present at the hearing and represented by counsel. Also, the trial court appointed Margaret Jefferson, Esquire, as the guardian *ad litem*/advocate for the Children.

called their first witness, DHS Supervisor, Ms. Michelle Ludwig. (N.T., 1/14/2022, at 13-60). Ms. Ludwig testified that the Children first became known to DHS in June 2018 when DHS received a GPS report alleging that Mother and N.M.M. tested positive for marijuana at N.M.M.'s birth. [*Id.*] at 15[.] Ms. Ludwig testified that DHS determined the GPS report was valid and implemented In-Home Services for the family. *Id.* at 15-19. Ms. Ludwig stated that her team was assigned this case on June 16, 2020, when DHS received a subsequent GPS report that the Children's sibling, G.M., passed away. Ms. Ludwig stated that her unit was assigned this case because she supervised the fatality and near fatality unit. *Id.* at 20-25. At this point, CUA was still providing the family with In-Home Services. [*Id.* at 16.] Ms. Ludwig further testified that, at the time of G.M.'s death, the Children were in Mother's care. *Id.* at 14-18. Ms. Ludwig testified that the June 2020 GPS report noted that G.M. sustained a rib fracture. However, because G.M.'s autopsy had not been completed, DHS could not confirm the cause of the injury, and the GPS report was determined to be invalid. [*Id.* at 16-17.]

Ms. Ludwig testified that DHS received a CPS report for serious physical injury on November 25, 2020, alleging that G.M. sustained a rib fracture that was consistent with child abuse. [*Id.* at 17.] Specifically, Ms. Ludwig testified that the allegations in the CPS report included "causing bodily injury to a child through recent act or failure to act." [*Id.* at 19.] Ms. Ludwig noted that the report indicated Mother and Father as the alleged perpetrators and the victim child as G.M. *Id.* at 3-8. Ms. Ludwig further testified that, after receiving the CPS report, she visited Mother and explained the extent of G.M.'s injuries. [*Id.* at 21-22.] The Children were then transported to St. Christopher's Hospital to have full skeletal surveys conducted based on the concerns regarding G.M.'s rib fracture. [*Id.* at 21.] Ms. Ludwig testified that throughout her investigation Mother was unable to provide an explanation as to how G.M. could have sustained the injuries, and [she] denied any knowledge of G.M.'s injuries. [*Id.* at 21-22.] Ms. Ludwig also testified that Mother and Father were the only identified caregivers for G.M. [*Id.* at 23.] The CPS report was indicated. *Id.* at 11-13.

Ms. Ludwig testified that DHS received an additional CPS report on February 5, 2021, with allegations against Mother and Father for causing serious bodily injury to a child through recent act or failure to act. [*Id.* at 29.] Ms. Ludwig testified that this CPS report involved a head injury sustained by the victim child,

G.M., and indicated Mother and Father as the perpetrators. *Id.* at 17-23. Ms. Ludwig testified that Mother could not provide an explanation as to how G.M. could have sustained a head injury. [*Id.* at 31.] Ms. Ludwig also testified that Mother did not state anyone else who cared for G.M. when she sustained the head injury. [*Id.* at 32.] This CPS report was indicated and stated that G.M. sustained injuries consistent with child abuse while in the sole care of Mother and Father. *Id.* at 7.

Ms. Ludwig further testified that[,] when she concluded her investigation, DHS had concerns regarding [the] safety and present danger to the Children in Mother's care. [*Id.* at 43-44.] Ms. Ludwig stated that due to these safety concerns[,] as well as G.M.'s unexplained injuries, it was in the best interests of [N.M.M. and M.M.] for DHS to obtain an OPC in order to ensure their safety. [*Id.* at 44.]

On cross-examination by the Child Advocate, Ms. Ludwig testified that she became aware that Mother hid her pregnancy and the birth of G.M. and M.M. from CUA. [*Id.* at 45.] Ms. Ludwig also testified that she…had concerns regarding reports of domestic violence between Mother and Father. [*Id.* at 48.]

Counsel for DHS then called their next witness, acting Chief Medical Examiner for the Philadelphia Medical Examiner's Office, Dr. Albert Chu. [*Id.* at 62-126.] Dr. Chu testified that he is currently employed at the Philadelphia Medical Examiner's Office ("M.E.") as the acting Chief Medical Examiner. [*Id.* at 63.] Dr. Chu testified that he has been employed by the Philadelphia M.E. since July 2014[,] and [he] has been the acting Chief Medical Examiner since August 2021. Prior to his current position, Dr. Chu was employed as the Deputy Chief Medical Examiner at the Philadelphia Medical Examiner's Office. Dr. Chu further testified that he specializes in forensic pathology and is certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. [*Id.* at 63.] Dr. Chu also testified that he has been qualified as an expert in forensic pathology in a court of law over two hundred (200) times. [*Id.* at 64.] On cross-examination by Mother's Counsel, Dr. Chu testified that he was not certified as an expert in child abuse. [*Id.* at 67.] Th[e] [trial court] qualified Dr. Chu as an expert in forensic pathology. [*Id.*]

Dr. Chu testified that he was the direct supervisor for Dr. Lyndsey Emery, the assigned pathologist who performed G.M.'s autopsy. [*Id.* at 66, 69.] Dr. Chu stated that he was familiar with this case, and [he] also reviewed Dr. Emery's reports in

preparation for the January 14, 2022, hearing. [*Id.* at 67.] Dr. Chu testified that his role as Dr. Emery's supervisor on this case was to provide guidance through conferences, assist in formulating a final opinion as to the cause and manner [of] death, [and]…to finalize and approve the autopsy report. [*Id.* at 69-70.] Dr. Chu stated that most of his recollection of this case stemmed from his review of Dr. Emery's Final Diagnosis Report in preparation for the January 14, 2022, hearing. [*Id.* at 71.] Dr. Chu testified that autopsy and final diagnosis reports are recorded and kept in the regular course of business by the Medical Examiner's Office. [*Id.* at 71-72.] Dr. Chu further testified that a report of examination[,] as well as a report of final diagnosis[,] were generated in this manner for G.M.'s case.

Dr. Chu testified that[,] while there were no acute injuries, there was evidence of prior injuries to G.M.'s head, brain, and ribs found during G.M.'s autopsy. [*Id.* at 80.] Specifically, G.M.'s autopsy showed old subdural and subarachnoid hemorrhages[,] as well as an injury to the brain due to the interruption of blood flow. *Id.* Dr. Chu testified that there was also evidence of a healing rib fracture. *Id.* Dr. Chu specified that the head, brain, and rib injuries did not occur immediately around the time of G.M.'s death. *Id.* Dr. Chu testified that [neither] routine CPR administered at the time of death, routine caregiving, nor co-sleeping with her twin would have caused G.M.'s rib fracture. [*Id.* at 84-85.] Dr. Chu also testified that based on her age G.M. could not have caused this injury to herself. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma. [*Id.* at 86.] Dr. Chu could not make a conclusion as to the cause of G.M.'s brain injuries, stating that those types of injuries can occur in various ways, including from birth trauma, significant force inflicted to the head, shaking, or accidentally. [*Id.* at 90-94.] Dr. Chu further testified that there was no indication…that G.M. sustained any birth trauma that may have caused the brain injuries. [*Id.* at 92-94.] Dr. Chu testified that the cause and manner of G.M.'s death was undetermined, but her death was not ruled as natural or accidental. [*Id.* at 95, 97.] Dr. Chu further testified that it was likely that G.M.'s injuries—specifically the rib fracture—were the result of abuse. [*Id.* at 97-98.] Dr. Chu testified that his finding was also included in the M.E. Final Diagnosis report regarding G.M. [*Id.* at 98.]

On cross-examination by the Child Advocate, Dr. Chu testified that the M.E. office found that G.M.'s brain injuries were blunt impact injuries. [*Id.* at 105.] Dr. Chu also gave his opinion

that G.M.'s injuries may have been caused by forceful shaking of the head without impact. *Id.* at 91. Dr. Chu further testified that these types of injuries can be sustained due to a fall, car accident, or other traumatic incident, but that the M.E. office has no documentation that G.M. was ever involved in any traumatic incident. [*Id.* at 106-07.]

On cross-examination by Mother's Counsel, Dr. Chu testified that he did not prepare a report for the January 14, 2022[,] hearing, but that he reviewed the M.E.'s records regarding this case prior to the hearing. [*Id.* at 115.] Dr. Chu stated that he reviewed the M.E. investigator's reports during the January 14, 2022[,] hearing. [*Id.* at 118.] Dr. Chu testified that he was not involved in G.M.'s autopsy nor did he review Dr. Emery's autopsy or final diagnosis reports contemporaneously. [*Id.* at 119.]

On redirect examination, Dr. Chu testified that there was no medical documentation from the M.E. office to account for G.M.'s brain injuries nor was there any indication in G.M.'s primary care physician records that account for these injuries. [*Id.* at 125.] Dr. Chu further testified there was no indication that G.M.'s premature birth caused G.M.'s rib fracture. If the rib fracture had been birth-related, this injury would have been resolved by the time she was four-months old—G.M.'s age at the time of her death. *Id.* at 122-25[.]

Mother's Counsel called [one] witness, current CUA Case Manager, Ms. Olivia Robinson. [*Id.* at 128-39.] Ms. Robinson stated that she was assigned this case on October 10, 2021. [*Id.* at 128.] Ms. Robinson testified that[,] since she was assigned the case, Mother has been compliant with CUA, signed all releases of information, provided proof of employment, and completed parenting in December 2020. [*Id.* at 128-30.] Ms. Robinson testified that she had not been able to conduct a home assessment on Mother's home. [*Id.* at 129.] Ms. Robinson further testified that she observed Mother's visits with the Children, which were consistent, and that Mother and the Children were bonded. [*Id.* at 129-31.]

On cross-examination, Ms. Robinson testified that she had safety concerns regarding Mother due to G.M.'s unexplain[ed] injuries. [*Id.* at 132.] She further testified that the Children are currently placed in Kinship Care with their paternal grandmother. [*Id.* at 132-33.]

Following argument [by] counsel, on January 14, 2022, the [trial court entered an order finding] that there was clear and

convincing evidence to adjudicate [N.M.M. and M.M.] dependent based on present inability and to find child abuse as to Mother. [The trial court ordered N.M.M. and M.M. be removed from Mother's and Father's home and continued placement by DHS in Kinship Care through Turning Points with paternal grandmother.] [The trial court] also [entered an order finding] that clear and convincing evidence was presented to make a finding of aggravated circumstances as to Mother.[3]

Mother timely filed [four] notices of appeal and a Concise Statements of Errors Complained of on Appeal on January 27, 2022, and an amended Concise Statement…on February 13, 2022. [This Court consolidated the appeals.]

Trial Court Opinion filed 2/18/22, at 2-10 (footnotes omitted) (footnotes added).

On appeal, Mother sets forth the following issues in her "Statement of the Questions Involved" (verbatim):

1) Whether the trial court erred as a matter of law or abused its discretion when it determined that G.M. was the victim of child abuse, and that the Appellant K.M.K. (Mother) was responsible for that abuse?

2) Whether the trial court erred as a matter of law where it determined that N.M.M. and M.M. (the Children) met the definition of dependent children?

3) Whether the trial court erred as a matter of law and abused its discretion when it ordered that it was clearly necessary to remove the Children from their parents' care?

4) Whether the trial court erred as a matter of law of [*sic*] abused its discretion when it found that that [*sic*] aggravated circumstances [e]xisted as to [M]other?

---

[3] Based on the testimony indicating that both parents were the primary caregivers of G.M., N.M.M., and M.M. at the time G.M.'s injuries were inflicted, the trial court also entered an order finding Father to be a perpetrator of child abuse. The trial court also entered an order finding aggravated circumstances as to Father.

> 5) Whether the trial court erred as a matter of law or abused its discretion when it admitted into evidence and relied upon the expert testimony of Doctor Albert Chu?
>
> 6) Whether the trial court erred as a matter of law or abused its discretion when it admitted and relied upon DHS Exhibit 7?

Mother's Brief at 3 (suggested answers omitted).[4]

Mother's first, second, third, and fourth issues are related. She challenges the trial court's finding that G.M. was a victim of child abuse and Mother was a perpetrator of the child abuse as provided for under the CPSL.[5] She further contends that, absent sufficient evidence that G.M. was a victim of child abuse and/or that Mother was the perpetrator of the child abuse, the trial court's dependency determination as to N.M.M. and M.M. is erroneous, as is the trial court's finding that aggravated circumstances existed. Mother further challenges the trial court's dependency disposition of removing N.M.M. and M.M. from Mother's home and placing them in Kinship Care.

The Pennsylvania Supreme Court has set forth our standard of review for dependency cases as follows:

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. We review for abuse of discretion[.]

---

[4] We have renumbered Mother's issues for the ease of discussion.

[5] Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301-6387.

*In the Interest of L.Z.*, 631 Pa. 343, 111 A.3d 1164, 1174 (2015) (quotation marks and quotation omitted).

Where, as in the case *sub judice*, the trial court deems parents to be perpetrators of child abuse under the CPSL, we note that "[although] dependency proceedings are governed by the Juvenile Act[6]…the CPSL controls determinations regarding findings of child abuse, which the [trial] courts must find by clear and convincing evidence."[7] *In the Interest of L.V.*, 209 A.3d 399, 417 (Pa.Super. 2019) (citations and footnotes omitted) (footnote added). "[T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Juvenile Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." *In the Interest of J.R.W.*, 631 A.2d 1019, 1023 (Pa.Super. 1993).

"As part of [a] dependency adjudication, a court may find a parent…to be the perpetrator of child abuse[ ] as defined by the…CPSL." *In the Interest of S.L.*, 202 A.3d 723, 728 (Pa.Super. 2019) (quotation marks and quotations omitted). Under the CPSL, "child abuse" is defined as "intentionally,

---

[6] Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6375.

[7] "Clear and convincing evidence" is defined as evidence that is "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation marks and quotation omitted).

knowingly, or recklessly doing" one of many acts, including causing bodily injury[8] to a child through any recent act or failure to act.[9] *See* 23 Pa.C.S.A. § 6303(b.1) (defining "child abuse").

Recently, in *In the Interest of C.B.*, 264 A.3d 761 (Pa.Super. 2021) (*en banc*), this Court relevantly set forth the following:

> Section 6381 of the CPSL, which governs evidence in court proceedings, states that "[i]n addition to the rules of evidence…relating to juvenile matters, the rules of evidence in this section shall govern in child abuse proceedings in court[.]" 23 Pa.C.S.A. § 6381(a). Specifically,
>
> Section 6381(d)]provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury…as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child. [*In the Interest of J.R.W.*, 631 A.2d at 1023 (quotation marks and quotation omitted). *See* 23 Pa.C.S.A. § 6381(d).]

---

[8] The CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(b.1) (defining "bodily injury").

[9] In *In the Interest of C.B.*, 264 A.3d 761, 773 (Pa.Super. 2021) (*en banc*), this Court held that a trial court's culpability determination as to whether the child abuse was intentional, knowing, or reckless is "superfluous." We held:
> Under Section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse "intentionally, knowingly, or recklessly." Rather, in Section 6381 cases, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible," permitting petitioners to "prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action [or inaction] of the parents or responsible person and the implausible statements of the parents and responsible persons."
*Id.* (quotation and citations omitted).

In ***In the Interest of N.B.-A.***, ____ Pa. ___, 224 A.3d 661 (2020), the Pennsylvania Supreme Court rather recently reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) of the CPSL is clear and convincing evidence.  [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency  determinations, 42 Pa.C.S.[A.] § 6341(c)[]….However, in certain situations, the identity of the abuser need only be established through *prima facie*[10] evidence.  As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, [an appellate] court is not bound by the [trial] court's inferences or conclusions of law.

***Id.*** at 668 (citation omitted).

\*\*\*

Section 6381(d) of the CPSL, found under the subchapter titled "**Miscellaneous Provisions**," establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." ***In the Interest of L.Z.***, 631 Pa. 343, 111 A.3d 1164, 1167 (2015).

To aid the [trial court] in determining whether a child has been abused, "the Legislature deemed it wise and necessary to establish a different evidentiary standard for finding child abuse by a parent or person responsible for the child's care, one in

---

[10] *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." ***In the Interest of L.Z.***, ***supra***, 111 A.3d at 1184 (citation omitted).

- 13 -

contrast to the overall standard for determining dependency under the Act." *Id.* The *J.R.W.* Court recognized:

> This lessened standard of establishing abuse by the caretakers [under Section 6381(d)], coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the [trial court] must apply in deciding abuse cases. *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required. We find no defect in this reasoning. Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus[,] the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

*Id.* at 1024. *See* [*In the Interest of*] *L.Z.*, [*supra*,] 111 A.3d at 1184 ("The Legislature, however, carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]").

Under Section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by…[DHS]…and the rebuttal of the parent or responsible person.

> [**In the Interest of**] **L.Z.**, [**supra**,] 111 A.3d at 1185….A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent. **Id.** at 1185-86.

***In the Interest of C.B.***, 264 A.3d at 770-73 (emphasis omitted) (bold in original) (footnotes omitted) (footnote added) (quotation and citations omitted).

In addressing Mother's claim that the evidence insufficiently established that G.M. was the victim of child abuse and Mother was the perpetrator of the abuse, the trial court relevantly indicated the following:

> [The trial court] determined that…child abuse was supported by clear and convincing evidence. [The trial court] heard credible testimony from DHS Supervisor, Ms. Michelle Ludwig, that the Children's welfare and safety were at risk in Mother's care. Ms. Ludwig testified that in June 2020, DHS received a GPS report alleging that the Children's sibling, G.M., passed away. At the time of the June 2020 [CPS] report, In-Home Services had already been implemented after N.M.M. tested positive for marijuana at birth. Following the June 2020 [CPS] report, Ms. Ludwig testified that DHS received two (2) CPS reports on November 25, 2020, and February 5, 2021, containing allegations of child abuse in connection to G.M.'s death. Specifically, the November 25, 2020, CPS report alleged that G.M. sustained a healing rib fracture consistent with child abuse. The February 5, 2021, [CPS] report alleged that G.M. also sustained head and brain trauma prior to her death. Both CPS reports

indicated Mother and Father as the perpetrators of abuse of the victim child, G.M.

Ms. Ludwig further testified that, throughout her investigation, Mother was never able to provide an explanation for how G.M. sustained the injuries. Ms. Ludwig further testified that Mother was the primary caregiver for G.M. and no other caregivers were identified for G.M. Ms. Ludwig stated that, when she concluded her investigation, DHS had active safety concerns for [N.M.M. and M.M.] based on G.M.'s indicated and unexplained injuries, and that removal from Mother's care was necessary to ensure the Children's safety and well-being. Current CUA Case Manager, Ms. Olivia Robinson, also expressed present safety concerns for the Children in Mother's care given G.M.'s unexplained injuries.

Ms. Ludwig's testimony was corroborated by Acting Chief Medical Examiner, Dr. Albert Chu. Dr. Chu testified that G.M.'s autopsy revealed evidence of a healing rib fracture, which likely occurred "a few weeks" prior to her death. Dr. Chu credibly testified that neither G.M.'s premature birth, CPR administered at the time of death, nor co-sleeping with her twin could have caused this type of injury. Dr. Chu also testified that, based on G.M.'s age, this injury could not have been self-inflicted. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma. Dr. Chu further testified that G.M.'s autopsy also revealed old head and brain injuries. Dr. Chu described the various ways this type of brain injury can occur, including birth trauma, blunt force trauma, shaking, or due to a fall, car accident, or other traumatic incident. Dr. Chu testified that the M.E. has no medical documentation to account for G.M.'s brain injuries. However, Dr. Chu further testified that there was no indication of any birth trauma, which may have caused the brain injuries, and [the] M.E. has no documentation that G.M. was involved in a fall, car accident, or other traumatic incident. Dr. Chu also testified that the M.E. office found that G.M.'s brain injuries were blunt impact injuries.

G.M.'s rib fracture and brain injuries sustained prior to her death greatly concern [the trial court]. The indicated CPS reports from November 25, 2020, and February 5, 2021, stated that G.M. sustained injuries consistent with child abuse while in the primary care of Mother. Additionally, Mother [has been unable] to provide a plausible explanation for the cause of G.M.'s injuries….Dr. Chu testified that CPR administered at the time of death could not have caused G.M.'s rib fracture because it was a healing injury, which

likely occurred a "few weeks" prior to her death. Dr. Chu also testified that, because G.M. was four months old at the time of her death, she could not have caused this type of injury to herself, nor could the injury have been caused by co-sleeping with her twin. Dr. Chu provided credible testimony that G.M.'s rib fracture was likely caused by abuse. Although Dr. Chu could not provide a definitive explanation for how G.M. sustained the head and brain injuries, he testified that there was no evidence that these injuries were caused by birth trauma or involvement in a traumatic accident. While the cause and manner of G.M.'s death were undetermined, her death was not ruled natural or accidental. The testimony also reflected outstanding dependency issues regarding [a] prior history of domestic violence, substance abuse, and concerns regarding Mother's parenting capacity….Mother's continued inability to provide an explanation as to how G.M. was seriously inured and later died in her care remains a barrier to reunification [with N.M.M. and M.M.] at this time.

\*\*\*

[W]hile the petitioning party in a dependency action must demonstrate the existence of child abuse by clear and convincing evidence, the identity of the abuser need only be established by *prima facie* evidence. Under Section 6381, the fact of abuse is sufficient [to] establish *prima facie* evidence of abuse by the parent or person responsible for the child's welfare….Specifically, the CPSL establishes the following rebuttable evidentiary presumption for finding child abuse by a parent or person responsible for the Child's care:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason on the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

\*\*\*

Applying 23 Pa.C.S.A. § 6381(d) and the relevant law to this case, the [trial court] properly determined that Mother was the perpetrator of the abuse. The victim child, G.M., was in the primary care and control of only Mother and Father during the time the injuries were discovered. Additionally, medical evidence

from G.M.'s autopsy demonstrated that the injuries sustained were "of such a nature as would not ordinarily be sustained or exist except by reason of the acts or omissions of the parent." 23 Pa.C.S.A. § 6381(d). Specifically, the two indicated CPS reports from November 25, 2020, and February 5, 2021, stated that G.M.'s injuries were consistent with child abuse. Mother and Father were the named perpetrators of abuse on the indicated CPS reports. Dr. Chu testified that G.M.'s rib injury was most consistent with inflicted trauma from abuse. The M.E. found that G.M.'s brain injuries were blunt impact injuries. While the cause and manner of G.M.'s death were "undetermined," G.M.'s death was not ruled natural or accidental.

Based on…the rebuttable presumption defined in 23 Pa.C.S.A. § 6381(d), [the trial court] properly determined that *prima facie* evidence existed to determine that Mother was the perpetrator of abuse. Throughout…[this] case, Mother has been unable to provide an explanation as to how G.M. could have sustained the rib fracture and brain injuries. However, the evidence clearly established that Mother and Father were the primary caregivers for G.M. at the time of her death and that G.M.'s injuries occurred while G.M. was in their primary care. G.M. sustained injuries of such a nature that would not ordinarily be sustained but for the acts or omissions of the person responsible for the welfare of the child. While [the trial court] was unable to determine which parent perpetrated the abuse, it properly found Mother perpetrated the abuse by omission even if she did not inflict any of the injuries. [The trial court] also properly determined that Mother failed to rebut the evidentiary presumption in Section 6381(d) by failing to present evidence establishing that G.M. was not in her care when the injuries occurred, or that she had no reason to believe that G.M. would be unsafe in Father's care.

Trial Court Opinion, filed 2/18/22, at 14-20 (citations and footnote omitted).

We find no abuse of discretion or error of law in the trial court's reasoning. Specifically, contrary to Mother's argument, we agree with the trial court that DHS established by clear and convincing evidence that G.M. was a victim of "child abuse" as defined by the CPSL. Medical testimony established

that the four-month-old infant, G.M., suffered rib, head, and brain injuries, which were the result of non-accidental trauma that occurred while Mother was responsible for G.M.'s welfare. *See In the Interest of C.B.*, *supra*. Moreover, Mother could not provide an explanation of how the injuries occurred.

Under these facts, the trial court properly applied the evidentiary presumption found at 23 Pa.C.S.A. § 6381(d), which establishes a *prima facie* case of abuse by the persons who were responsible for the child when the abuse occurred, and properly found Mother failed to rebut this presumption. *See In the Interest of C.B.*, *supra*.[11]

As this Court has held, the rebuttable presumption is necessary to ensure the safety of a child (and the child's siblings) when the child has been under her parents' care, has been abused, and the identity of the perpetrator cannot be established. *See id.*

> In essence, [the rebuttable presumption] forces caregivers either to come forward with the identity of the perpetrator of abuse or be assigned fault where it was their responsibility to care for the

---

[11] Similar to the case *sub judice*, in *In the Interest of C.B.*, *supra*, DHS established, by clear and convincing evidence, that a five-month-old infant suffered injuries that were neither accidental nor self-inflicted and were of such a nature that they would not ordinarily be sustained except by reason of the acts or omission of the parent or other person responsible for the infant's welfare. This Court held the trial court properly found the infant was the victim of "child abuse" as defined by the CPSL. *Id.* at 776. We further held the trial court properly applied the Section 6381(d) presumption since the parents were the primary caretakers of the infant, and the parents failed to rebut the presumption by establishing the infant was not in their care when he suffered his injuries. *See id.*

child and keep the child safe. As emphasized by our Supreme Court…"when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." [**In the Interest of L.Z.**, **supra**, 111 A.3d at 1185.]

**In the interest of C.B.**, 264 A.3d at 77-78.

Accordingly, for all of the aforementioned reasons, we conclude the trial court properly found that Mother was a perpetrator of child abuse under Section 6381(d).

Regarding Mother's challenge to the trial court's adjudication of N.M.M. and M.M. as dependent, she claims that, since G.M. was not a victim of child abuse and/or Mother was not a perpetrator of the abuse, the trial court's dependency determination is erroneous. However, having found Mother was a perpetrator of abuse as to G.M., we find her issue challenging the trial court's adjudication of dependency as to N.M.M. and M.M. moot. **See In the Interest of C.B.**, **supra** (finding moot parents' challenge to trial court's adjudication of dependency as to multiple children where trial court found parents perpetrators of abuse as to one child); **In the Interest of R.P.**, 957 A.2d 1205, 1213 (Pa.Super. 2008) (stating where trial court finds one sibling abused, court may determine other siblings dependent, even if they have not been abused).

Regarding Mother's averment that, after the trial court adjudicated N.M.M. and M.M. dependent, the trial court erred in its disposition of placing

the Children in the custody of DHS and Kinship Care, we disagree.[12] Mother argues the trial court erred since its determination was made based on an erroneous finding that G.M. suffered abuse and Mother was a perpetrator of the abuse. However, as indicated *supra*, we hold the trial court did not err in its finding of child abuse perpetrated by Mother. Thus, Mother is not entitled to relief on this claim. ***See In re R.P.***, ***supra***.

In her next issue, Mother contends the trial court erred in holding that aggravated circumstances existed as to Mother. Specifically, she avers that, since there was no evidence G.M. suffered abuse and/or that Mother was a perpetrator of the abuse, the trial "court also erred in finding that aggravated circumstances existed as to Mother." Mother's Brief at 48. However, as indicated *supra*, we hold the trial court did not err in its finding of child abuse perpetrated by Mother. Thus, Mother is not entitled to relief on this claim.[13] ***See In re R.P.***, ***supra***.

_____

[12] If the court finds that a child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S.A. § 6351(a). ***In re D.A.***, 801 A.2d 614 (Pa.Super. 2002) (*en banc*), Here, the trial court determined it was in the best interest of N.M.M. and M.M. to remove them from their parents' care and place them with paternal grandmother through Kinship Care.

[13] If the trial court adjudicates a child dependent, and either the county agency or the child's attorney has alleged aggravated circumstances exist, the court must then determine the veracity of those allegations. ***See*** 42 Pa.C.S.A. §§
*(Footnote Continued Next Page)*

Mother next contends the trial court erred in permitting the expert testimony of Chief Medical Examiner Dr. Albert Chu. Specifically, she contends Dr. Chu's expert opinions regarding the manner and cause of G.M.'s injuries violated Pa.R.E. 703 since he was merely a conduit for the opinions of Dr. Lyndsey Emery, who completed the autopsy/autopsy reports and was unavailable to testify at the dependency hearing.

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court[,] and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment[ but, rather, is] the overriding or misapplication of the law, or the exercise of judgment[,] that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused[,] and it is the duty of the appellate court to correct the error.

***Commonwealth v. LeClair***, 236 A.3d 71, 78 (Pa.Super. 2020) (citation omitted).

---

6341(c.1), 6351(e)(2). If the court finds by clear and convincing evidence that aggravated circumstances do exist, it must consider whether reasonable efforts to prevent or eliminate the need to remove the child or to preserve and reunify the family should be made or continue to be made. ***See id.***

In the case *sub judice*, the trial court found "aggravated circumstances" existed under the following circumstances:

(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302(2) (defining "aggravated circumstances"). The trial court directed efforts shall continue to be made to preserve the family and reunify N.M.M. and M.M. with Mother and Father.

As a general rule, "expert testimony is admissible, in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training[,] knowledge, intelligence and experience." **_Commonwealth v. Walker_**, 625 Pa. 450, 92 A.3d 766, 788 (2014). The admissibility of expert testimony is governed generally by Rule 702 of the Pennsylvania Rules of Evidence, which provides:

> **Rule 702. Testimony by Expert Witnesses.**
>
> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702 (bold in original).

> The law provides that:
>
> expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence. Accordingly, the Pennsylvania Rules of Evidence prescribe a threshold for admission of expert testimony dependent upon the extent to which the expert's opinion is based on facts and data.

**_Gillingham v. Consol Energy, Inc._**, 51 A.3d 841, 849 (Pa.Super. 2012) (citation omitted). Thus, an adequate basis in fact must enable the expert to

opine with a reasonable degree of certainty and is incompetent if it lacks an adequate basis. *See id.*

With regard to the bases of opinion testimony by experts, Pa.R.E. 703, upon which Mother relies, relevantly provides the following:

**Rule 703. Bases of opinion testimony by experts**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703 (bold in original).

Furthermore, it is noteworthy that "Pa.R.E. 705 requires an expert witness to testify as to the facts or data upon which the witness's opinion is based, whether or not the facts or data would otherwise be admissible in evidence." *In the Interest of D.Y.*, 34 A.3d 177, 182 (Pa.Super. 2011) (*en banc*) (citation omitted). That is, the rules allow expert opinion testimony based in part on otherwise inadmissible facts and data contained in a report upon which experts in the field would reasonably rely in forming an opinion. *Id.*

"When the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as [inadmissible] hearsay in disguise." *Woodard v. Chatterjee*, 827 A.2d 433, 444-45 (Pa.Super. 2003) (quotations omitted).

- 24 -

However, it is well-settled that "an expert may not act as a mere conduit of hearsay or transmitter of extrajudicial information." ***Commonwealth v. Towles***, 630 Pa. 183, 106 A.3d 591, 606 (2014) (quotation omitted). As the Comment to Pa.R.E. 703 provides:

> An expert witness cannot be a mere conduit for the opinion of another. An expert witness may not relate the opinion of a non-testifying expert unless the witness has reasonably relied upon it in forming the witness's own opinion.

Pa.R.E. 703, Comment.

> In interpreting the Comment to Pa.R.E. 703, this Court has held:

> An "expert" should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation, the non-testifying expert is not on the witness stand and truly is unavailable for cross-examination. The applicability of the rule permitting experts to express opinions relying on extrajudicial data depends on the circumstances of the particular case and demands the exercise, like the admission of all expert testimony, of the sound discretion of the trial court. Where…the expert uses several sources to arrive at his or her opinion, and has noted the reasonable and ordinary reliance on similar sources by experts in the field, and has coupled this reliance with personal observation, knowledge and experience, we conclude that the expert's testimony should be permitted.

***Woodard***, 827 A.2d at 444-45 (quotations omitted). ***See generally Commonwealth v. Ali***, 608 Pa. 71, 10 A.3d 282, 306 (2010) ("[A] medical expert who did not perform the autopsy may testify as to the cause of death as long as the testifying expert is qualified and sufficiently informed[.]") (citation omitted)); ***Commonwealth v. Brenner***, 256 A.3d 38 (Pa.Super.

filed May 18, 2021) (unpublished memorandum)[14] (holding forensic expert permitted to offer expert testimony where she formed an independent conclusion and testified to that conclusion based on her review of both inadmissible facts and data contained in another non-testifying forensic expert's report).

The rule governing expert testimony is born, in part, out of the following premise:

> The expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he[,] or she[,] relies, both because the expert has demonstrated his[, or her,] expert qualifications and because the expert regularly relies on and uses similar data in the practice of his[,] or her[,] profession.

*Primavera v. Celotex Corp.*, 608 A.2d 515, 519 (Pa.Super. 1992). The data relied upon by the expert in reaching his, or her, conclusions and opinions must be "the kind of data used daily by experts in making judgments, reaching diagnoses, and taking action." *Id.* at 519-20.

In the case *sub judice*, DHS offered Chief Medical Examiner Dr. Chu as an expert in the field of forensic pathology, and after the parties examined Dr. Chu regarding his qualifications, the trial court accepted him as an expert in the specified field. N.T., 1/14/22, at 63-67. Dr. Chu testified he was familiar with the autopsy of G.M. since he directly supervised Dr. Lyndsey Emery, who

---

[14] Pursuant to Pennsylvania Rule of Appellate Procedure 126, unpublished, non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. Pa.R.A.P. 126(b).

performed the autopsy. *Id.* at 66. He testified that, in relation to the instant matter, he provided guidance to Dr. Emery, and "because there was a pretty prolonged period of time between when the autopsy was initially done and the case was finally classified,…the case [came] up for periodic review[.]" *Id.* at 70. Thus, Dr. Chu conferenced with Dr. Emery to give her guidance regarding G.M.'s autopsy and "to help [her] formulate a final opinion as to the cause and manner of death." *Id.* Dr. Chu admitted that he "did not actually sign off" on Dr. Emery's final cause and manner of death; however, he "perform[ed] consultations and conferences with Dr. Emery as her supervisor on this case." *Id.* at 70-71.

Dr. Chu testified he reviewed the autopsy reports, including the Final Diagnoses Report, which were prepared by Dr. Emery, in formulating his opinions for the hearing. *Id.* at 71-72. He noted these reports are of the type regularly created and relied upon by the Medical Examiner's Office. *Id.* Dr. Chu then opined that G.M.'s injuries to her head, brain, and rib did not occur immediately around the time of G.M.'s death. *Id.* at 80. He opined G.M.'s rib fracture resulted from "some kind of inflicted injury[,]" such as someone squeezing G.M.'s chest hard. *Id.* at 84. He further opined G.M.'s head and brain injuries resulted from "some kind of significant force being applied to the head[,] such as an impact or shaking." *Id.* at 91. He indicated "[i]t's possible" the injuries contributed to G.M.'s death. *Id.* at 94. He offered an

opinion, to a reasonable degree of medical certainty, that G.M.'s injuries were due to physical abuse. *Id.* at 97-98.

Here, contrary to Mother's contention, we conclude the trial court did not violate Pa.R.E. 703 in permitting Dr. Chu to render his expert opinions. The record reveals Dr. Chu had independent knowledge of G.M.'s autopsy and was sufficiently informed of the matter. Using his own professional expertise and experience, he formed an independent conclusion and testified to that conclusion based on his own knowledge of the autopsy, as well as the facts and data contained in the autopsy reports. *See In the Interest of D.Y.*, *supra*. He testified that the facts and data he relied upon in forming his opinions were of the type reasonably relied upon by experts in the particular field. *See* Pa.R.E. 703.

Thus, contrary to Mother's contention, we conclude Dr. Chu did not "act as a mere conduit" for Dr. Emery's opinions. *See Woodard*, *supra*. Rather, he rendered his opinions based on his own expertise and judgment. *See id.* Accordingly, we hold the trial court did not err in permitting Dr. Chu to offer his opinions as to the manner and cause of G.M.'s injuries. *See generally Commonwealth v. Buford*, 101 A.3d 1182 (Pa.Super. 2014) (holding that where the individual who performed autopsy is unavailable to testify, a qualified testifying expert is one whose testimony was based upon his own conclusions after his own independent review of the file).

In her final issue, Mother contends the trial court erred in admitting into evidence DHS Exhibit #7, which was the Philadelphia Medical Examiner's Office Final Diagnoses Autopsy Report ("autopsy report") under the business record exception to the hearsay rule.

Initially, we note that, during the hearing, Mother's counsel objected to the "opinion testimony" contained within the autopsy report. N.T., 1/14/22, at 74. That is, Mother's counsel indicated:

> It is opinion testimony that is not admissible. The document as to maybe simple data could be admissible, but any opinion is an opinion of Dr. Emery's, and which is obviously unreliable since Dr. Chu did not do what Dr. Emery did back in 2020. So, it's totally unreliable and should be inadmissible.

*Id.* at 74. The trial court overruled the objection. *Id.* at 76.

Assuming, *arguendo*, the opinions contained in the autopsy report were inadmissible under the business records exception to the hearsay rule, Mother was not prejudiced by the court's error since the report was cumulative of Dr. Chu's properly admitted expert opinions. *See Brenner*, *supra* (holding that where forensic report was testimonial hearsay and improperly admitted due to author being unavailable and the defendant not having a prior opportunity to cross-examine him, the introduction of the report was harmless since cumulate of other expert's proper testimony).

For all of the foregoing reasons, we affirm the trial court's orders.

Affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/7/2022*